RAY HIGGINS, Plaintiff-in-Error, v. MRS. NELLE STEIDE, Defendant-in-Error. —335 S. W. (2d) 533.

Western Section, Jackson.  April 28, 1959.

Certiorari Denied by Supreme Court September 3, 1959.

Don G. Owens, Memphis, for plaintiff in error.

Harry Rubert, Memphis, for defendant in error.

AVERY, P. J. (W. S.). This is a damage suit for personal injuries and property damage brought by Mrs. Nelle Steide against Ray Higgins, and while it comes to this Court as hereinafter indicated, Ray Higgins was defendant below and will be herein referred to by that designation. Mrs. Nelle Steide was the plaintiff below and she will be herein referred to by that designation, except where each party is referred to by name.

When this case was tried in the Circuit Court of Shelby County, Division One, Honorable Greenfield Q. Polk, Judge, there was a verdict in favor of plaintiff for $15,000 damages for personal injuries and $254.26 damage to her automobile. Motion for new trial was overruled, exceptions saved, appeal prayed and granted, on the execution of proper appeal bond, and sixty days were allowed the defendant to prepare and file his bill of exceptions, which was an extension of thirty days beyond the statutory period. Counsel for defendant labored

under the false impression that the extension of time in which to file the bill of exceptions also extended the time in which to perfect the appeal, and therefore he did not file the appeal bond during the thirty-day period allowed therefor under the law, so that he had no appeal in error perfected.

With the record in that condition, he prepared a petition for writ of error and supersedeas, presented it to a member of this Court, the Honorable L. D. Bejach, who granted the petition upon the execution of the usual appeal bond of $250 and directed the issuance of the writ of supersedeas upon the execution of a bond for interest, damages, and costs in the penal sum of $2,000, and the case stands in this Court to be heard on writ of error.

The damages sought resulted from collision of automobiles on April 25, 1957. The suit was instituted on December 9, 1957, by summons and filing same day the declaration. A general issue plea was filed on January 7, 1958. Pursuant to some court order, not appearing in the record but so recited in the special pleas, the specific pleas were filed on March 4, 1958. Deposition of Dr. W. H. Gragg was taken in behalf of plaintiff on May 16, 1958, and of Dr. B. G. Mitchell on May 26, 1958. On May 29, 1958, on motion to dispose of objections to these depositions, the objections were overruled.

On the trial of the case in Shelby County Circuit Court, the actual introduction of evidence was closed on Tuesday, June 10, 1958. On the following Monday, June 16th, the Trial Court permitted the plaintiff to reopen the case for proof and then continued the hearing until the following Wednesday, June 18th, to permit the plaintiff to obtain a further witness who was introduced at

that time over the objection of defendant, after which the jury was charged and the verdict was rendered.

The first three Assignments of Error are:

(1) No material evidence to support the verdict.

(2) The verdict is against the weight of the evidence.

(3) The verdict is against both the law and the facts, with no explanation of why.

Without further comment on these three Assignments of Error, they are overruled. The record clearly shows some evidence to support a verdict. We are not concerned with the weight of the evidence and no reason being assigned here as to why the verdict is against the law and facts, we will pass to the other Assignments of Error.

Assignments of Error 4 and 5 are leveled at the alleged erroneous action of the Trial Court in permitting Dr. B. G. Mitchell, referred to as an evaluating or examining physician only, to testify relative to the conclusions, opinions and findings of (a) subjective symptoms, and (b) conclusions based upon speculation and conjecture.

Assignment of Error No. 6 is leveled at the action of the Court in permitting Dr. W. H. Gragg to testify that a blow in plaintiff's chest, received in the accident which caused her injury, resulted in a hiatal hernia, because his conclusions were based on speculation and conjecture.

Assignments of Error 7 and 8 are leveled at the so-called excessive verdict—(a) upon the theory that Dr. B. G. Mitchell testified that there was only 5% permanent disability, which would not justify such an amount of damages; and (b) that the verdict is so excessive as to

indicate passion, prejudice and unaccountable caprice on the part of the jury.

Assignment of Error 9 is leveled at the action of the Court in permitting the plaintiff to reopen the case on Monday, June 16th, after it had been closed on the previous Tuesday, June 10th, continuing the hearing to June 18th, and permitting the plaintiff to introduce further witnesses. It is said this was error because "it resulted in a disconnected piece-meal trial of the cause".

■ Continuances are matters addressed to the sound discretion of the Trial Court and his decisions in that regard will not be disturbed except in cases of abuse of that discretion, or in which it appears a clear case of injustice has been accomplished.

■ Likewise matters of permitting additional proof after counsel for the parties have announced that proof is closed, is within the discretionary action of the Trial Court, and unless it appears that such action of the Trial Court has thereby permitted an injustice to be done a party to the suit, such action will not be disturbed on appeal.

Counsel for both parties on Monday, June 2, 1958, announced they were ready for trial and thereafter the case was continued from day to day until June 9, 1958, when the trial actually began. The parties closed their proof on Tuesday, June 10th, at which time the Court made the following statement to the jury:

"The Court: That concludes the proof. Now, gentlemen, because of this unusual situation, you will go until Monday in this matter without hearing anything further. The next thing to be heard are

the arguments of counsel and the charge of the court. Let me just ask you one more time not to discuss the case among yourselves, nor to discuss it with anyone, nor to let anyone discuss it with you at home or wherever you may be. You are not to attempt to make an investigation at the scene of this occurrence. You are excused until Monday, and I hope you have a very pleasant week-end. Thank you.''

Thereupon the Court adjourned until Monday morning, June 16, 1958. When the case was called on Monday, June 16, 1958, in accord with the instructions of the Court to the jury above referred to, learned counsel for plaintiff then said to the Court that when the subpoena for the Negro, J. W. Willis, was offered in proof just before the case was closed on the previous Tuesday, he began to make inquiry of the employer of this boy Willis and of his aunt and his wife; that he had no difficulty in locating J. W. Willis in Chicago; that he got on a plane Wednesday night and went to Chicago, saw Willis on Thursday morning, took a statement from him, and was informed that he, Willis, had given a statement to Mr. Owens about how this accident occurred; that he had given this Negro money to pay his railroad fare, talked to his boss, and that the Negro was supposed to leave Chicago Sunday night on the 6:10 train for Memphis; that on Sunday evening while he, counsel, was at his office he received a special delivery letter returning the money, $36, which letter is as follows:

''I am very sorry but I just can't make up my mind to come to Memphis and be in court. Sorry, sir, but I am afraid I have never been in nothing like this before, so I just can't come. Please let me stay out of this. J. W. Willis.''

Counsel further stated that after he received that message, he called this man Willis by telephone and talked to him. The witness promised that he would come, but stated he had to make arrangements at home, and he had not heard from him since, and the witness was not present in court. Counsel asked the Court to reopen the case and continue it until the following Wednesday, offering to take the boy's deposition in Chicago in the meantime, to which counsel for defendant would not agree. He told the Court that he had been misled by the declaration to the effect that there was a wrecker with automobile attached in the middle one of the three lanes, and that the defendant's proof showed that the wrecker and the wrecked car afforded an opportunity to the plaintiff to be concealed from the defendant, and she had come out in front of him and immediately stopped, leaving him no time to stop his car before striking her. He informed the Court that he could prove by the boy Willis that the wrecker was in the outside lane next to the curb and not in the middle traffic lane, as he had been led to believe.

The Court then asked counsel if he was prepared to state into the record as a part of his application what Willis would testify to. Then the following statements were made by counsel and the Court:

"Mr. Rubert: Willis will testify, according to a diagram I have here, that he was in the southernmost lane, in the righthand lane next to the curb line, on Central. In other words, that he was right next to the curb. That he pulled past Alexander going south and stopped intending to back into a driveway.

"The Court: So that the record will not be in error, he pulled past and beyond the southern exten-

sion of Alexander, but he, when doing so, was going eastwardly. Is that correct?

"Mr. Rubert: Yes, sir. He was going east on Central, and he passed Alexander that goes to the south. He pulled on past the first driveway and stopped. When he stopped Mrs. Steide was sitting up there at Alexander going east next to the center line with her arm out getting ready to make a left-hand turn. That in his opinion, the colored boy said, she must have sat there three to five minutes. Two or three automobiles were also going east and went between the wrecker and Mrs. Steide's automobile, and they slowed down.

"The defendant was behind these two automobiles, and when these two cars slowed down to go between the wrecker and Mrs. Steide's car, the defendant whipped over to the left lane, and when he whipped over there he was too close to Mrs. Steide, and he skidded on into her and hit her. And she had been sitting there for a long period."

This precipitated a lengthy argument between counsel and the Court, in which counsel for defendant called to the Court's attention that plaintiff's counsel had tried his case upon the theory that no wrecker was there and his witnesses said that they did not see a wrecker, but had now come to the conclusion that a wrecker was there and he insisted that it would be abuse of the Court's discretion to permit a continuance of the case and to reopen the proof, with the jury waiting. Counsel for defendant also stated that it would be a great inconvenience for him to make a trip to Chicago to take a deposition and further argued that plaintiff's counsel

could not be misled by the pleadings or any statement that was made. The Court then made this statement:

"The Court: Now, Mr. Rubert, here is the way I see it. You want him to waive the rule and go to Chicago. He says he cannot do that. You want him in the alternative to introduce a statement he has from this man, and you say you will be bound by each and everything in it. He says he will not do it. I cannot order him to do that. Therefore, I have no choice in the matter except to let the matter stand where it is now with the proof closed. I can't compel him to waive the five-day rule on taking depositions. How can I do that?"

That suggestion by the Court precipitated further argument by counsel for both parties of considerable length, during which argument counsel for plaintiff said that if the Court would reopen the matter, he would have the witness Willis there by Wednesday morning. In response to the argument that followed, the Court then said:

"The Court: Except this, Mr. Rubert. I realize the technicality of having closed the proof."

That statement precipitated further argument in which counsel for plaintiff said that the Court on June 10th at the closing of the proof had turned to the jury and said: "That is all the proof". And counsel for plaintiff argued that by virtue of that statement he did not have opportunity to say that he did or did not have further proof. The Court then said: "You could have interrupted me."

That brought further argument from counsel for both parties. Plaintiff's counsel argued that plaintiff would

be done a great injustice unless the Court took the action requested. Defendant's counsel insisted that to take such action would be a great injustice to him and to his client. After considerable argument, the Court inquired of counsel for plaintiff what assurance he had that the witness Willis would be there, to which counsel answered:

"Mr. Rubert: Last night he said he would, and he apparently went over to his family last night and they convinced him not to come. I think I can go up there and talk to his boss, that we will not have any trouble.

"The Court: Mr. Rubert, with no more assurance that the man will be here, and the objection of counsel in this situation, I don't see how I can do that."

That brought forth further argument from counsel for both sides and the Court, and then the Court said:

"The Court: I don't see how I can do that with no more assurance than that. And I am sorry to have to give you that answer."

Thereupon counsel for plaintiff asked the Court if he would continue the case generally. After further argument, the Court replied:

"The Court: I don't know of any way humanly possible to do that.

"Mr. Rubert: We can do anything.

"The Court: The only thing I know is to cut it off clean as a hound's tooth, that you take a non-suit and start all over again. We couldn't continue it."

That brought forth further argument from counsel for plaintiff, after which counsel for defendant called the

Court's attention to the fact that the Court had ruled on the question several times; that the litigants and witnesses had been put to trouble and he wanted to dispose of the matter "as the law contemplates", but would have no objection to plaintiff taking a non-suit.

After further argument, and the record disclosing that the Court had consulted with counsel in other cases then pending and set, the Court granted the request, saying:

"The Court: * * * * this Court is going to grant Mr. Rubert's request to put this case over until Wednesday morning at 9:30 o'clock in the morning, at which time the case will either proceed with such proof as he tenders to the court in rebuttal, or the case will proceed as it would have proceeded this morning."

Counsel for defendant saved exceptions to the action of the Court, calling attention of the Court to the fact that this case had been pending during the trial and during these extensions for approximately two weeks. And to that the Court replied:

"The Court: You may have your exception, but in my best judgment this is a matter I feel I am entitled to exercise discretion, and I am willing to do it."

With that statement he called the jury into the court room and said:

"The Court: Gentlemen of the jury, a situation has arisen in the case on trial whereby the Court— no one else; this is my responsibility—the Court is going to continue the hearing of this case until Wednesday morning at 9:30 A.M., at which time the

Court will ask you gentlemen to report back here to the jury room, and we will proceed further at that time."

After the above had occurred, the record shows that counsel for plaintiff went to Chicago by plane, brought this witness Willis back on the plane, had him there to testify at the time on Wednesday to which the case had been continued. At that time there was argument between counsel for both parties about certain statements made openly in the Court; that statements had been allowed to be made in the court room by Mr. Rubert to the effect—"Mr. Owens, I will settle for your policy limits." Further, that counsel for plaintiff had gone to the client of Mr. Owens, telling him that the case could be settled within the policy limits. Counsel for plaintiff admitted that he took both actions, saying:

"Mr. Rubert: * * * I said it to Mr. Owens. I did walk over to his client and make the statement".

And he admitted it was in Mr. Owen's absence, but that none of this was said where the jurors could hear him. There was considerable argument about the matter, and the record reveals the following:

"(Whereupon, the jury entered the court room, when and where in the presence of the jurors the following proceedings were had:)

"Mr. Owens: I might state to the jury, may it please the Court, that the case is being reopened without going into the argument at this time.

"The Court: There was no formal application to that effect in the presence of the jury so that will

have to be done. Mr. Rubert, you may proceed with your application.

"Mr. Rubert: If your Honor, please, when your Honor made the statement last week about all the proof, your Honor did it without asking me whether I had any rebuttal. I either ask to reopen, your Honor, please, or as rebuttal to put this witness on. In either event I make that request.

"The Court: No suggestion was made at that time about any further proof, and so the Court said: All the proof had been concluded in the case. Now, gentlemen, a request has been made to reopen the proof for the purpose of presenting a witness in rebuttal prior to, of course, any further proceedings in the cause. The Court's discretion is such that it can allow that to be done, and I do allow it for the purpose of presenting what is rebuttal proof and rebuttal proof only."

No explanation is shown at any place in this record as to what constituted the "unusual situation" which the Court said to the jury on Tuesday, June 10th, caused the postponement of the argument of counsel and charge of the Court to the jury until the following Monday, June 16th. There is no application from or any request by either counsel for such action. Apparently no juror was sick, and no request being made to hold the jury over just for the argument and charge of the Court, the writer of this Opinion is left to conjecture, unless he could take judicial knowledge of something that was to and did occur, which might have caused the "unusual situation".

■ I think it is entirely proper to take judicial knowledge of the fact that the Acts now codified in Sections

17-401, to 17-407, created the Judicial Conference, the membership of which consists of the Judges of all Courts of the State whose salary is paid in whole or in part by the State, and that this Conference shall meet annually, and by Section 17-404 the Conference shall set the time and place of each annual meeting. I can also take judicial knowledge of Section 17-405 which makes it the official duty of each member to attend the Conference upon its annual meeting unless ''otherwise officially engaged or for other good and sufficient reasons''; and it is highly probable that I can take judicial knowledge of the place where and the date of the convening of that Conference. The writer has personal knowledge of the fact that this Conference convened in Memphis, Tennessee, on June 11, 12, and 13, 1958. I think, however, that I cannot take judicial knowledge, in the absence of any showing whatever in the record, that a Judge would postpone the completion of a jury trial which only lacked the argument of counsel and charge of the Court, on the day before the convening of the Conference, for the purpose of attending it nor that he did attend the Conference, with no statement relative to the date or hour of convening of the Judicial Conference whatsoever in the record. This record indicates that in order to finish that trial, he was ''officially engaged'', which would have been a good and sufficient reason for non-attendance.

The record shows—and the learned Trial Judge was certainly aware of the record so showing, that Mr. Ewing, one of the counsel who filed this suit and was associated then in the trial, attended the trial of Mr. Higgins had in City Court under his citation by the traffic police shortly after the accident occurred, and that a court reporter made a record of the testimony given by

Mr. and Mrs. Higgins at that trial. This appears in the record before us by virtue of the fact that counsel for defendant, on cross-examination of Mr. and Mrs. Higgins, read questions and answers given by them, showing they then testified to the fact that there was a wrecker, with an automobile attached to it, there at the intersection where this accident occurred, attempting to back into Alexander Street, so that although counsel states that he was misled by the pleas of defendant setting up the fact of his contention relative to the wrecker being at the scene of the accident, he had known long before the declaration was filed that defendant had already testified that the wrecker was there. Now, when the application was made on Wednesday to reopen the proof, it seems that he was contending that he had discovered new evidence after the parties had closed their proof and the Court had so announced on Tuesday, June 10th, he was in the same position as he would be, had he been asking the Court to set aside a verdict which might have gone against him on the grounds of newly discovered evidence and would have faced the fact,—with the knowledge that he had on the date of the trial in the City Court, of the diligence required of him to have located that witness had he desired to do so and had him present during the trial. To approve such procedure will establish, in our opinion, such a precedent that could lead to undue prolongation of the trial of cases to the congestion of court dockets and embarrassment of litigants and trial courts.

We doubt that it is within the exercise of sound discretion to continue a case for the reopening of proof, under the circumstances shown by this record, and permit counsel for either party to fly to some distant city to locate witnesses that he had had an opportunity to have

located long before. In other words, it seems counsel for plaintiff expected defendant to produce the driver of the wrecker as a witness, and when defendant did not do so, counsel for plaintiff, for the first time, became interested in getting the witness on the day of the closing of the proof, when his whereabouts could have been ascertained from witness' mother and wife within the city where the trial was being had and where the accident had occurred, just as plaintiff's counsel then did. We think the attitude of the Trial Court taken in the course of the argument, when counsel very clearly argues that it is the duty of the Court to lend his office to the administration of justice, shows much judicial patience and desire to be just, yet in our opinion there can be no justification for continuing a case and reopening the proof under the facts here disclosed.

We are, therefore, constrained to sustain the Assignment of Error to the effect that the Court did unduly extend his judicial discretion in so doing.

That leaves this reviewing court in the position of determining whether or not, based upon this entire record, we are in position to say affirmatively that the verdict of the jury was affected by the introduction of the evidence of this Negro, J. W. Willis. We have carefully read this entire record, more than once, and we are doubtful that the evidence of this late arrival rebuttal witness affirmatively affected the verdict of the jury, which is to say that though we do not approve the action of the Trial Court and feel that he did err, we doubt that such error affected the verdict of the jury and, entertaining such doubt, we cannot affirmatively find that it did so. T. C. A. Sec. 27-117.

When the testimony of this Negro is carefully examined, in the light of the fact that he had given a written statement to counsel for defendant as to how the accident occurred soon after it happened, dated May 5, 1957, in which there are direct conflicting and contradictory statements to those given by him in his testimony, such as conflicts in his estimate of the speed of defendant's car at the time it collided with plaintiff's car, and in that he backed into Alexander Street, turned around and left the scene of the accident, driving west on Central, and his statement on the witness stand that he did not do so but drove on east on Central without turning around, coupled with the further fact that it took two trips to Chicago and much persuasion plus expense money to get him to the place of trial, we think that neither the Court nor the jury could attach much weight to his testimony. The learned Trial Judge had the statement from counsel for plaintiff, after counsel had made his first trip to Chicago and had his first talk with this witness, that he would prove by the witness that he drove his wrecker on past the intersection of Alexander and Central to the "first driveway", intending to turn at that point, but this witness, when produced in Court after the second trip of counsel to get him, said he stopped at the intersection and intended to back into so-called South Alexander to turn.

Dr. J. A. James had treated Mrs. Steide for a duodenum ulcer sometime in the early 40s which had no connection with the ruptured hiatus. She had a sort of continuous treatment for the duodenum ulcer, with the last x-rays being in 1950 or 1951. He had also removed her gall bladder in 1954. He had seen Mrs. Steide and given her a routine check-up examination on the 26th of

February, 1957, but no x-rays were made at that time. On that date he made a general physical examination, procured and examined a smear for cancer, which was negative. The record indicates that Dr. James was what we might refer to as the family physician of Mrs. Steide. He explained that in 1950 or 1951, when he made the final x-rays in connection with determining the result of his treatment for the duodenum ulcer, that these x-rays were what is referred to as a barium study, which he described as barium taken through the mouth and into the digestive tract before the x-rays were taken, and with respect to this test and in connection with his examination and treatment of Mrs. Steide after she had the involved accident and injury, he was asked and answered as follows:

"Q. Dr. James, did Mrs. Steide have any evidence of a hernia prior to April 25, 1957?

"A. The only thing I can say to that is the work that was done on this duodenal ulcer in 1950 or 1951. The X-rays—the lastX-rays—I don't know the exact time—did not show a hiatus hernia then."

He then stated that after the x-rays were made following the accident and injury, they showed this hiatus hernia. His testimony reveals the fact that this test was an x-ray with barium and he testified positively that these x-rays showed that Mrs. Steide at that time –following the accident, had this hiatus hernia.

Dr. James did not claim to be a thoracic or chest surgeon, but he was a treating physician. from the day of the injury through the entire time that she was in the hospital and he studied the x-ray showings. He related how Mrs. Steide said the accident occurred and that he

had made a thorough examination on April 25, after this injury, of the body of Mrs. Steide. He was asked with respect to the bruises on her body and the objective evidence which he discovered. He said he found bruises on her left shoulder, on her knee, on the left side of her head, on her buttocks, and on her left hip; that she complained greatly at that time of pain in her neck and shoulders, and some in her chest, but he found no bruises on her chest or on outside of abdomen. His statement is:

"I examined her all over, and then sent her right on to X-ray."

He assigned her to the hospital, called a consultant, particularly with respect to the pain in her neck, saying that:

"I called a consultant because of her inability to move the neck."

He related how this first consultant, Dr. Ogle, had put Mrs. Steide in traction, in which she stayed about ten days; that on the 30th he called a Dr. Beverly Ray to examine her for fracture but none was found.

He related how she was nauseated and, knowing her gall bladder had been removed, he suspicioned some condition in the common bile duct, which might have caused it. He had a gall bladder test run on the 30th, which showed a normal condition and on May 1st, a complete gastro-intestinal x-ray made, and it showed a hiatus hernia for the first time. He described her nausea as creating such a vomiting condition that "we gave her medicine to stop the vomiting", and that when this x-ray revealed this hiatus hernia, also the superficial ulcer, he called Dr. Wilfred Gragg, who was a chest specialist.

During his examination, he related how he has assisted Dr. Gragg in the performance of this operation to repair the hiatus hernia, saying that he held the left lung and the heart back out of the way while the operation was performed. He was asked whether he could say that the hernia showed from its appearance that it had been recently caused, and to that he responded with the explanation that he did not directly observe that rupture during the operation due to the fact that he was not in position to see it while holding the heart and lung back out of the way for Dr. Gragg's surgery, and therefore was not able to say whether it indicated a recent ruptured condition or not.

Dr. James said he saw Mrs. Steide every day she was in the hospital and with respect to the hernia he was asked and answered, over objection of counsel for defendant, as follows:

"Q. Dr. James, I will ask you whether or not this hernia in the hiatus could or might have resulted from being struck in the stomach by a blow such as being thrown forward and hitting the steering wheel of a car?

"A. That was my opinion that it was caused from the blow pushing the stomach up, that being the softest place where the esophagus goes through the stomach and most easily torn."

Dr. James further stated that he had seen the patient every month since the accident. His exact statement is:

"I have seen her every month except one since that time; sometimes once during the month and sometimes several times."

He also said that during the times he had seen her since she left the hospital she complained of some pain in the neck and a feeling of nausea.

In considering the testimony of medical doctors, we must remember there is a distinct difference between a treating physician—one that is with the patient daily from the inception of the injury until she has had her hospitalization, and as her family physician who continued to see her, or one who examined her body, located injuries and performed surgery, and a physician who is merely doing an evaluating examination.

There appears no contradiction of the evidence given by Dr. James relative to his diagnosis based upon the objective findings and the history related to him by the patient as to how the injury was caused.

Dr. Wm. Sanders Ogle described his special field as that of neurological surgery, which deals with the nerves and, particularly, that part of the body up and down the spine and neck. He was called to see Mrs. Steide by Dr. James on April 25, 1957. He stated:

"She was complaining bitterly of pain in the head, primarily in the back of the neck, the neck, shoulders, chest, abdomen, lower back, and in and around the right knee. She was also nauseous and had vomited several times."

He described the neck as being stiff with any motion in any direction causing discomfort. He said:

"My examination did not reveal evidence of any injured nerves. By that I mean, torn or compressed nerves or otherwise involved. And I felt that she had sustained a strain of the neck; her x-rays were

obtained and they did not show any fracture or dislocation of the neck itself. Therefore, I elected to simply treat her conservatively with bed rest, various medicines to alleviate her pain and to help her combat her vomiting, and prescribed cervical halter traction. Which is a means of applying some weight or stretching to the head in an effort to relieve painful muscle spasm in the neck."

His objective findings are described to be "much limitation of motion * * * much muscle spasm". On cross-examination, he said:

"I could find only that her neck was extremely stiff. The muscles were very tight. They were in spasm, and there was very marked limitation of neck motion. But, of course, I had to rely on her as to how much actual flexion and extension there was."

And from his examination, with no injury to the nerves, he said that in his opinion, based on these objective findings and on the history of how the accident occurred, that the patient had "a sprain or a strain to occur". Again, may we say that Dr. Ogle was a treating physician and his testimony is entirely competent. Dr. Ogle related how the plaintiff had returned to his office for several visits after he had discharged her and said that the symptoms he found, with no nerve injury, justified him in referring her to Dr. Mitchell who was an orthopedic surgeon, saying that when Mrs. Steide continued to complain with respect to her injury in the neck, he concluded that her complaints might arise from purely a "skeletal defect" and that was the basic reason for referring her to Dr. Mitchell. The record reveals this occurred some-

time in 1958 and that Dr. Mitchell saw her first on March 1, 1958.

██ The Assignment of Error relative to the testimony of Dr. W. H. Gragg is based upon the assumption that Dr. Gragg said:

"that a blow in the plaintiff's chest received in the collision caused the hiatal hernia."

It is said that it is error to admit his evidence because based on speculation and conjecture, and invaded the province of the jury. An examination of what he did and said, so far as this assignment is concerned, will be found in his answers to the following questions:

"Q. Now, Dr. Gragg, did you have occasion to see and treat a Mrs. Nelle Steide?

"A. I did.

\*  \*  \*  \*  \*  \*

She was first seen at the St. Joseph's Hospital on May 3rd, 1957.

\*  \*  \*  \*  \*  \*

At that time the physical findings in regard to my examination were of no consequence. The x-ray findings were the important feature and they showed a small esophageal hiatus hernia of the diaphragm.

"Q. Now, Dr. Gragg, did she give you a history of how she was involved in an accident?

"A. She stated that she was injured in an accident and had received some blow to the abdomen."

He then described the type of hernia as follows:

"An esophageal hiatus hernia is a displacement of the upper portion of the stomach through the normal opening in the diaphragm into the chest. The stomach normally lies below the diaphragm; in an esophageal hiatus hernia the upper part of it has come through the normal opening into the chest cavity."

At that time he stated:

"She was complaining of some abdominal pain and of nausea and of vomiting.

\*　　\*　　\*　　\*　　\*　　\*

"The prescribed treatment at that particular time was simply medications to cut down the acidity in the stomach and to relax any muscle spasm associated with it."

Dr. Gragg said he saw her again on May 9th and 10th, on which latter date he performed an esophagoscopy, which he explained required an anesthetic and consisted of inserting a lighted tube through the mouth down into the esophagus, and that in addition to the rupture he found a small superficial ulcer in the mucosa, which is the lining of the esophagus, near the point of rupture. He explained a transthoracic repair operation which required going through the left pleural cavity, between the seventh or eighth interspace on the left, making an incision some 14" long; that he repaired the hernia which he said would stop the condition that had caused the ulcer and it would heal spontaneously. The specific statement at which the Assignment of Error is leveled seems to be in answer to the following questions:

"By Mr. Rubert: Q. Now, Dr. Gragg, I will ask you whether in your Opinion this accident caused the hernia that you found in Mrs. Steide? A. I think I will have to answer it this way: That I think it is quite possible that the hernia was caused by the accident.

"Q. Doctor, let us don't use the word "possible". What I want to know is this: From the facts as described to you by Mrs. Steide, when she was thrown against the steering wheel, whether or not that could cause abdominal pressure? Is that correct, sir? A. An increased abdominal pressure?

"Q. An increased abdominal pressure? A. Yes.

"Q. I ask you whether the increased abdominal pressure could cause or could precipitate the hernia in the hiatus? A. In my opinion it could."

Dr. Gragg further explained that this rupture permitted the gastric juices to escape through the hiatus and not only the nausea but the superficial ulcer was caused thereby. He explained that the traction treatment aggravated the situation saying:

"A. There is no question in my mind but the fact that this woman was lying flat in bed in traction was the precipitating cause of her ulcer. The worst thing that an individual with a hiatus hernia can do is to lie flat in bed. When these hernias are treated medically the upright position is the most important part in the treatment, and they are kept in somewhat of an upright position, that is, with the head and shoulders elevated constantly even during sleep."

On cross-examination, he was asked and answered:

"Q. Doctor, with respect to the hernia that you found, can you say with any degree of certainty that that hernia was caused as a result of this accident? A. Can I make a qualified statement on that?

"Q. Yes, sir. A. I would like to answer that question in this way. There is no absolute proof of which I am aware that these hernias are produced by certain instances; that is, there is no documented evidence that an injury can produce it. We assume that it can be and is when we have a situation in which the intra-abdominal pressure is increased terrifically and where we have an individual who has had no previous symptoms suggestive of a hernia, and who has had previous barium studies which did not show the hernia present. That is, we have pretty good evidence in this particular case that one was not present before the accident and yet we find one after the accident. We know that in the accident the intra-abdominal pressure is markedly increased, which we know, again, can push the stomach through this opening in the diaphragm.

"Q. What evidence do you have that no hernia existed prior to this accident? A. She had had previous barium studies in the course of her treatment for the duodenum ulcer.

"Q. I believe you said that you personally had not read those? A. I had not read those.

"Q. Then you had no personal knowledge as to whether or not she had a previous hernia? A. No, only the reports of the X-rays."

In view of the fact that Dr. Gragg had the history of the nature of the accident, as well as access to the X-rays that were made long prior to the accident; that he saw her soon after the accident; that by his careful examination he found this hernia and ulcer, and repaired the hernia with surgery, we think his testimony is competent.

Assignments of Error leveled at the testimony of Dr. Mitchell are far more serious. He did not see her until March 1958, but he examined the x-rays made at St. Joseph Hospital about the time of the injury and he made three x-rays in his office. He testified extensively, that is, his testimony is of considerable length. He administered no treatment. She was seen and examined by him at the request of Dr. Ogle relative to the cervical region alleged injury, and on cross-examination he was asked and answered:

"Q. Did you actually treat the lady or merely examine her? A. She was sent here for evaluation.

"Q. Then, as I get it, you are not a treating physician. You are what we call an evaluating physician; is that right, sir? A. On this occasion, I guess I was.

\*    \*    \*    \*    \*    \*

"Q. Excluding what Mrs. Steide told you, what did you, yourself, find, relying on your senses? A. I found that this patient, on instruction, carried out movements of the cervical region of her spine rather cautiously and with jerky movements *out of all proportion to the degree of physical manifestations of the injury. This movement, as elicited, may have been somewhat limited with no evidence of muscle spasm.*

"Q. When you say she moved rather cautiously and with jerky movements all out of proportion to your findings, does that mean you could not find, yourself, any reason for her cautiousness? A. There was not sufficient physical manifestations of injury to warrant it. *There were no physical manifestations for the jerky movements* this patient used to demonstrate the range of motion which she presented.

"Q. In other words, you couldn't find, yourself, the reasons for her cautiousness? A. No, sir. (Emphasis supplied.)

On direct examination, Dr. Mitchell had previously stated:

"My examination revealed a well-developed and preserved woman of fifty-nine years who appeared in no acute distress."

Then when he was asked about the examination of x-rays which were reported to him by Dr. Ogle, as having been made at St. Joseph's Hospital, he said:

"These x-rays revealed no evidence of bone or joint injury. There was some osteoporosis, or thinning of the bone, of the cervical spine with a narrowing of several intervertebral spaces, and some hypertrophic arthritic changes; but all of these were felt to be proportionate to the age of the patient."

He was then asked and answered:

"Q. Doctor, by that last statement, I take it that you do not attribute these last things to this accident; is that correct?

"A. No, sir."

He stated positively that he found no objective findings other than what may have been some limitation of motion, and he was asked:

"Q. And what is the percentage of disability, if any, that you found, sir?

"A. On the basis of the pain on which this woman complained and which appeared might be justifiable, it was my recommendation she be awarded a disability to approximately five percent of the body."

The ital in the above quoted evidence is for emphasis, without citing the many cases that discuss objective and subjective symptoms. The definition of each is simply stated in the learned Opinion of the late Presiding Judge Faw of our Court of Appeals, in Gulf Refining Co. et al v. Frazier, 15 Tenn. App. 662, 689, when he quoted with approval this statement:

" 'Objective symptoms are those which the surgeon discovers from a physical examination of his patient; subjective symptoms are those he learns from what his patient tells him.' Dean v. Wabash Railroad Co., 229 Mo. 425, 442, 129 S. W. 953."

In that same Opinion there is a detailed analysis, with proper citations, of how far a physician may go when examining a patient solely for the purpose of testifying, in the absence of any treatment and, more particularly, based alone upon the statements by such patient, together with observation of movements and demonstrations by the patient.

He also quotes with approval from 22 C. J. 670, saying:

"* * * a medical observer must base his opinion upon objective rather than subjective symptoms." See, also, 32 C. J. S. Evidence sec. 536.

He also quotes from Chesapeake & Ohio Railway Co. v. Wiley, 134 Ky. 461, 121 S. W. 402, 409, which Kentucky case we will refer to further hereinafter.

We have carefully examined what has been said by Justice Swepston of the Supreme Court in his Opinion written while a member of this Court, in the case of International Harvester Co. v. Sartain, 32 Tenn. App. 425, 469, 222 S. W. (2d) 854, 873:

"The trial court very accurately applied the distinction here by allowing the doctor to testify to obvious scars and wounds, but not as to the equilibrium test."

Dr. Sparr in that case had made reference to the equilibrium test, but he had also testified to the objective findings of scars, wounds, and shrinking of limb. Dr. Sparr expressed his opinion on the facts as given, that Sartain was not then and would not be able to work on elevated structures the rest of his life.

In the case of Mayor, etc., of Knoxville v. Klasing, 111 Tenn. 134, 136, 137, 76 S. W. 814, wherein the physicians were permitted to state what in their opinion produced a certain type of fever which plaintiff had contracted from gases inhaled by him from a city dump, the physician said:

"There is some slight difference between the doctors as to whether it was miasmatic or typhoid fever, or both. This difference is much less marked than is usual among medical men in their diagnosis of

disease and its character, and in this respect is rather remarkable; but all the physicians agree that the foul air and gases generated by rubbish dumped by the city's agents into a manhole near plaintiff's premises, and used by the city's direction as a deposit for garbage, created a nuisance, and was sufficient to cause the sickness, and was its origin.''

That Opinion reveals the fact that these physicians knew that either type of fever which the plaintiff contracted could be traceable to this gaseous condition from this garbage, the odors of which they were familiar with, and that the plaintiff had such fever.

The cases also quote from the Text on Evidence as it relates to hearsay and expert evidence and its admissibility. We quote from the case of Chesapeake & Ohio Ry. Co. v. Wiley, supra, referred to by Judge Faw in the case of Gulf Refining Co. v. Frazier, supra, wherein he has some quotations from this Opinion. In the Kentucky case, it is said [134 Ky. 461, 121 S. W. 409]:

"Now it is proposed that the rule be further extended, that a physician selected by the party for the sole purpose of procuring his testimony on the trial of a lawsuit may be told by the party what his past sensations and symptoms were, or what they then are, and to have the doctor, upon that evidence, which would not be receivable as evidence in court, base an opinion as to the cause and probable duration of the party's ailment, and give in that opinion as evidence that he was then or had been afflicted with that ailment. How a party acts under such circumstances is not on a different plane from what he says. A nod, a jerk of the hand, the wink of an eye, or the mobility

of a leg under pressure, may all be the voluntary result of the will, as much as the spoken word, and be actuated by the same motive. All subjective evidence furnished by the plaintiff under those conditions is on the same plane.

"Many authorities have been cited and examined, and will be found in the notes of the reporter. We do not cite from them, as any one desiring to test the accuracy of the reasoning by which we undertake to sustain our conclusion, and the character of the authority which we follow, we have recourse to the whole of each case, and more satisfactorily note its appositeness; but the language of the Supreme Court of Illinois, in the recent case of Greinke v. Chicago City Ry. Co., 234 Ill. 564, 85 N. E. 327, so clearly expresses what we deem not only the prevailing rule, but the better reason, that we take from it this extract; 'No such safeguards, however surrounded him when he is being examined by an expert whom he has employed to examine him and to give evidence in his case which is about to be tried in court. To permit the injured party, while undergoing an examination by an expert in his employ, by jerks and twitches, by a pressure of his hand, by turning his toes, or dragging one of his legs when walking, to thus make evidence for himself, and then to permit his expert to go before the jury and bolster up and strengthen by his opinion the self-serving testimony thus manufactured by the injured party, would open up the door wide for the grossest fraud, which might work upon his adversary the most palpable injury. The character of self-serving testimony has been held incompetent by the Supreme Court of Michigan in

McKormick v. City of West Bay City, 110 Mich. 265, 68 N. W. 148, and Comstock v. Georgetown Township, 137 Mich. 541, 100 N. W. 788, and the general rule announced by that court is, we think, in entire harmony with the ruling of this court in the numerous cases hereinbefore cited, and is the correct rule and the one most conducive to justice. We do not intend to hold, however, that a physician may not be able, from an examination of an injured party, to form and express an opinion as to his physical condition and the probable cause which induced such condition, based upon objective testimony alone; but what we do intend to hold is that a physician who has not treated the injured party, but who has made an examination of the injured party solely with a view to testify as an expert, should not be permitted to express an expert opinion to the jury based upon subjective conditions, and then be allowed to fortify his opinion by stating to the jury acts of the injured party which could have been purely voluntary and under the control of the injured party, and which may rest upon no other basis than the truthfulness of the injured party.' "

In the Illinois case therein referred to, the physicians were appointed by the Court to examine the patient for the purpose of giving their testimony. It is argued that they should be permitted to testify, based on the subjective findings in view of the fact that they are wholly disinterested by having been appointed; and commenting upon the similarity of physicians when so appointed and ones which might be chosen by the patient, the Court said:

"When they examine the party physically, of necessity they must observe what he does in apparent response to their tests. If the party is endeavoring to deceive the examiners, he may simulate pain, or involuntary muscular action. In so far as the tests of the examiners have resorted to the subjective, they do not seem to be on a different footing than if the examination was made by a physician of the party's own selection."

While it may not be expressly found in the record now before us that Dr. Mitchell was examining this plaintiff solely for the purpose of testifying, he was making his examination as requested by Dr. Ogle for "evaluation purposes". Now when this doctor who was making that examination for evaluation purposes is brought upon the stand to testify in behalf of the plaintiff, can it be said that there is any dictinction between an examination for evaluation purposes and an examination by a physician to enable him to testify in one's behalf, and particularly, where one of the doctors who was selected by the plaintiff and did treat her and had discharged her months before, and the examination for evaluation purposes was made long after this suit was instituted, it seems to us it does fall in the same category as if the examination had been made for the express purpose of testifying.

We think Dr. Mitchell's evidence of this percentage of disability based on what he himself saw of the patient and heard from her lips and saw the motions of her head, which he explained in the way hereinabove quoted, makes his evidence incompetent, and that the Court should have sustained the objection relative to what he said about the

percentage of permanent disability as related to the whole body.

We are not overlooking the statements in many of the appellate court opinions to the effect that the competency of such evidence must be considered in relation to the facts of the particular case, but we can say that when the testimony is offered by a non-treating physician for evaluation and testifying purposes only, it must be based on some objective symptoms and not on subjective symptoms, such as peculiar motions of parts of the body that the so-called patient can pretend, whether real or feigned.

Again, however, with the competent testimony of Drs. James, Ogle, and Gragg, we are unable to say that this error on the part of the Court in admitting this evaluation testimony, affirmatively affected the verdict of the jury, particularly when he limited his evaluation of permanent disability to only 5% as related to the whole body.

Upon the same authorities which we have hereinbefore referred to and the authorities referred to in those Opinions, we have reached our conclusions with respect to the admissibility of the testimony of the other three physicians.

The view we take of this case makes it necessary to briefly outline the contention of the parties as shown by their proof.

In the first place, except for this driver of the wrecker, the only eye witnesses to the actual impact were plaintiff, defendant and his wife, Mrs. Higgins. The plaintiff's version is that she came into Central Avenue off Buntyn, which is some 12 or 14 blocks west of where the accident occurred, and drove directly east on Central in the lane

next to the center line until she reached this intersection where Alexander leaves Central to the north; that as she was arriving at that intersection she gave a left turn signal by the extension of her hand and arm, together with the blinker light signal on her car; that when she was about to make that turn, the traffic in the opposite direction was such as required her to stop before she could proceed across the lanes of that traffic; that she stopped there for some three minutes with her hand extended and her left turn blinker light on, and while at a complete stop there, her car was suddenly hit from the rear with a heavy blow which jerked her neck, threw her chest and the upper part of her stomach against the steering wheel and her knee against the dashboard; that she blacked out momentarily and someone came and helped her out of the car. She described her pain from then on through the time she was in the hospital and up to the date of the trial. She said Dr. James first examined her and she had been under his care ever since, and she related how she was examined and treated by him, Dr. Ogle and Dr. Gragg, and described the pain and suffering she endured. Pictures of her body in traction and other parts of the bruised sections of her body are shown by exhibits. She explained how she was nauseated from soon after the accident until the operation by Dr. Gragg. She summarized her expenses as follows:

| | |
|---|---|
| Hospital | $ 1198.45 |
| Dr. James | 295.00 |
| Dr. Ogle | 125.00 |
| Dr. Mitchell | 30.00 |
| Dr. Gragg | 610.00 |
| Special nurse care | 213.00 |
| Ambulance | 20.65 |

| | |
|---|---|
| Drugs | 85.71 |
| Chewing Gum | 1.50 |
| Taxicab to and from doctor's office and hospital | 5.70 |
| Maid service necessary in her home on account of her illness | 279.00 |
| Loss of time | 2131.08 |
| Damage to automobile | 254.26 |

all of which she said totalled approximately $5,243.35, which is approximately correct and about which there is no dispute.

David B. Johnson said that he was in his car in his driveway ready to back out into Central, just a short distance east of the accident, heard the crash, turned, looked in that direction, saw Mrs. Steide's car before it came to rest, and that the left blinker light was flashing. He backed into Central and passed immediately by the point of collision, did not stop, but observed Mrs. Steide holding her neck.

Kenneth Larkey, who lives in the house on the northesat corner of the intersection where Alexander leaves Central going north, said he was approximately 100 feet from the scene of the collision, but did not see the actual impact; that the impact produced a rather loud noise, he looked around from where he was standing on his lawn, saw the cars, walked over to Mrs. Steide's car within a matter of seconds and helped her out of her car; that as he saw the cars, one was headed somewhat northeast-wardly across the center line of Central and a portion of the lane north of the center, and the other was in the lane next to the center line headed east; that he helped Mrs. Steide out of her car and into a chair on his lawn; that

the front of one car was about even with the west side of Alexander leading north and the other was about in the center of the intersection turn; that there was room on the south side of the two cars for traffic to clear going east on Central and that there was also room on the north side of Central for traffic to clear going west.

This witness was handed what is referred to as a diagram of the intersections of Alexander and Central; was asked to draw some rectangular spaces about where the two cars, as he remembered, would be located. He made these with ink in one of which appears the letter "S" (supposedly standing for Steide) and in the other the letter "H" (supposedly standing for Higgins). He explained that Mrs. Steide appeared to be suffering with some pain and that his sister went with her in the ambulance to the hospital. He said he did not notice any blinker signal lights in operation on Mrs. Steide's car.

Mr. Higgins testified that as he approached the intersection where the collision occurred, he was trailing two cars, the one nearest to him being a Ford, at a distance of about 100 feet, and that he was traveling in the inside lane. A summary of what he said is:

"There was a wrecker picked up a car and he was sitting in the right lane. * * * he was headed to the left of south. * * * He was on my right. * * * At the time I passed the wrecker, there was a car whipped around in front of me for a left turn, and I hit it. * * * I did not see it until it jumped in front of me. * * * The front part of my vehicle hit the back part of her vehicle."

He was then asked about directional lights and signals, and he said he saw "no signal whatsoever". And further:

"I never saw the car before until I was passing this wrecker until it whipped out in front of me. I never saw this car before."

He explained that the first he saw of Mrs. Steide's car was while he was passing a wrecker, and that she stopped very close to him, he applied his brakes, skidded his casings some 12 to 15 feet and struck the back of her car; that Mrs. Higgins was thrown to the floorboard of his car; that he saw a man come out to Mrs. Steide's car and help her out; that about the time the man got to her car he saw her left directional blinker light come on, and after Mrs. Steide was helped out of the car by this man, he, Higgins, walked up to it and turned the left blinker light off. He said he did that because the light was not on at the time he hit her car.

Mr. Higgins said the impact advanced Mrs. Steide's car some 12 or 15 feet in front of him. He was not at all positive as to where Mrs. Steide's car had come from when it stopped in front of him. He would sometimes say it came in front of the wrecker; other times that it came from behind the wrecker; east of the wrecker; and when he was asked directly a question in this regard, he answered:

"Q. Do you know where she came from?

"A. No, I don't."

His testimony is not convincing as to how Mrs. Steide brought her car in front of his, nor does he know what happened to the Ford car which he said he was trailing by 100 feet and which was the nearest one to him.

Mrs. Higgins' testimony about where Mrs. Steide came from to get in front of their car is not clear. She made the following statement:

"The first thing I knew we run upon a wrecker with a car, and it was stopped. About the time we passed it, why there was a car pulled over in front of us, and I mean it hadn't got straight in front of us until we hit.

"Q. Now, had you seen that car before? A. No, sir, not until it pulled right over in front of us.

"Q. Did it stop? A. Yes, sir.

"Q. Did you see any signal, arm or light? A. No signal, no turn.

"Q. How far in front of you was the car when it came from behind the wrecker? A. Just a very few feet."

She explained that the collision moved Mrs. Steide's car over into the center lane of the traffic going west and about 10 or 12 feet in front of where Mr. Higgins' car came to rest; that the collision jammed the fender back against the left front door of their car and Mr. Higgins could not get out; that she got out of the car and Mr. Higgins got out on her side.

Photographs of both cars were exhibited in the record, which showed very plainly that the front end of the Higgins car hit the rear end of Mrs. Steide's car. As stated, the testimony of both Mr. and Mrs. Higgins leaves much to be desired so far as clarifying just what they did see before the collision and how it actually occurred, and

leaves considerable doubt that defendant or his wife were keeping the proper lookout ahead.

On the physical facts shown by the resulting damage to each automobile, the positive evidence of the plaintiff, the unsatisfactory testimony of Mr. and Mrs. Higgins, the distance from the east margin of Alexander Street where it enters Central from the south to the west margin of Alexander Street where it enters Central from the north, shown to be 111 feet, without any testimony from Willis, the driver of the wrecker, still leaves ample evidence to support the verdict of the jury, particularly with reference to the negligence of Mr. Higgins. Thus we conclude, as hereinbefore stated, that we cannot affirmatively find that the verdict was affected by the testimony of this witness Willis.

Passing now to the Assignments of Error leveled at the amount of the verdict. Assuming that the actual loss of Mrs. Steide was approximately $5,000 growing out of the physical injury, this would leave her $10,000 for her suffering, pain, and mental anguish. She was 59 years of age. Her earnings are reflected in this record. Her superior and associates operating the concern for which she worked, Walgren Drug Store, say that she is not able to do the work that she did before the accident. Some of her neighbors have testified to the same effect as to her housework. Her doctor has advised her to limit her labor activities, both by not working full time nor for long hours. She had this severe operation. It has been said on many occasions, without making it necessary to refer to citations, that the jurors are the best authority to fix the amount of the damage and the Trial Judge is next best. He approved the verdict and we think we are

hardly in any position to say that it is excessive, or that it is so excessive as to reflect undue influence, sympathy, partiality, caprice, or improper conduct of any kind on the part of the jury. Her suffering was rather intense. The surgery and treatments all were painful. The jury evidently found that she had a rather severe whiplash injury and that this peculiar hernia, referred to as hiatal hernia, could have been and was caused by the excessive abdominal pressure on the stomach brought about by the collision.

We think the testimony of Drs. James, Ogle and Gragg, is competent; and even if the evidence of Dr. Mitchell to the effect that she had a 5% permanent disability as related to the whole body is wholly disregarded as incompetent, based upon his failure to find or to state any objective symptoms whatever justifying his conclusions, we conclude that we should not reduce the amount of the verdict.

The result therefore, notwithstanding we think the Trial Judge erred in permitting the case to be reopened and allowing this witness Willis to testify, because counsel for plaintiff was not diligent in his effort to ascertain the whereabouts of this witness Willis and have him present, if he desired to have his testimony, at the very beginning of this trial.

. All of the Assignments of Error, except that one with respect to the procedure in permitting the reopening of the evidence, under the circumstances revealed by this record and the one relative to the competency of the testimony of Dr. Mitchell, are overruled, and it being our opinion that the errors complained of in the two Assignments sustained cannot be affirmatively determined to

have affected the verdict of the jury, the verdict and judgment of the Court thereon are affirmed with costs.

Judgment will be entered in this Court dismissing the writs of error and supersedeas, and for the plaintiff and against the defendant for the amount of the verdict and judgment below, $15,254.26, together with interest thereon from the 27th day of June, 1958, for which interest judgment will be rendered against defendant and his sureties on his supersedeas bond, and for costs against defendant and his sureties on his appeal bond.

Carney and Bejach, JJ., concur.