HUBBARD, Respondent, vs. EQUITABLE LIFE ASSURANCE SOCIETY, Appellant.

*January 8—February 15, 1946.*

For the appellant there was a brief by *Shea & Hoyt,* attorneys, and *C. F. Mikkelson* of counsel, and oral argument by *Seward R. Stroud* and *Ralph M. Hoyt,* all of Milwaukee.

For the respondent there was a brief by *Vaudreuil & Vaudreuil* of Kenosha, and oral argument by *L. E. Vaudreuil.*

MARTIN, J. This is an action by plaintiff, the named beneficiary, to recover on three life insurance policies issued by the defendant-appellant on the life of plaintiff's husband, Eugene W. Hubbard. The insured disappeared the latter part of May, 1936, and has not been heard from since that time. This action was commenced on the 18th day of December, 1944, eight years and seven months from date of disappearance.

The insured was an attorney at law, thirty-six years old, and for about seven years prior to November, 1935, had been in the employ of a law firm in Chicago. In the fall of 1935 Mr. Hubbard started drinking quite heavily, which he continued to do until the date of his disappearance. Because of his excessive drinking he was discharged from his position with the Chicago law firm some time in November, 1935. In March, 1936, he secured employment with the Chicago Title & Trust Company in Chicago. He continued in the employ of the Title & Trust Company until May 16, 1936, the last date on which he was seen by his family.

The only issue on this appeal is whether or not the jury's finding that the insured died between May 26, 1936, and February 1, 1937, is sustained by any credible evidence. The respondent contends that a jury issue was created by the following circumstances: The fact that the insured and his wife had always lived together in domestic tranquillity; that he was a lawyer and had a position with the Chicago Title & Trust Company; that his daily routine was nearly invariable and included appearance for work at definite hours and the return to his home at the end of his work; that he was not a wanderer and was devoted to his wife and two weeks' old son; that there were no quarrels or other crises or difficulties in his affairs to explain the sudden and protracted disappearance; that on the morning of his disappearance he had planned to come home as usual and take his mother-in-law shopping, and mow the lawn; that instead of coming home he went on a

drinking spree in the vicinity of his home; this was on a Saturday afternoon.

Respondent argues that there is no evidence of any motive for Mr. Hubbard's disappearance, nor of any explanation for his failure to communicate with his wife and family if he continued to live beyond May 26, 1936, or the period expiring February 1, 1937. Plaintiff testified that her husband said on a number of occasions that if he continued drinking like he had been he would commit suicide; that "after he sobered up, she thought he tried to straighten himself out, but it seemed as though he could not help himself. That when he talked about suicide that usually occurred after he was coming out of it and realized what a fool he had been. He usually was very remorseful when he came out of those drunks, sort of cried, became hysterical and begged his family for help. It appeared that although he drank, he did not want to do so. He stated that he could not bear to continue to ruin his life and Mrs. Hubbard's and that he would commit suicide if he could not control his drinking;" that the nervousness he manifested after drinking was of the depressive type; that he was very nervous and somewhat despondent after sprees.

It appears that after her husband's disappearance Mrs. Hubbard notified the Insurance Company of his disappearance; that Mr. Hinkle, the insurance agent, wrote to all the alumni associations of the Alpha Tau Omega fraternity, of which Mr. Hubbard was a member, and to every Alpha Tau Omega house throughout the country, asking them to notify him if Mr. Hubbard called there; Mr. Hinkle also inclosed a photograph of Mr. Hubbard. Plaintiff also contacted the police department in Wilmette, Illinois; in Madison, Wisconsin; and in Grand Forks, North Dakota; she also wrote Mr. Hubbard's oldest sister, who had been in touch with the Hubbards constantly, and to all his living aunts and uncles; she also wrote the passport division of the department of state,

to all the armed services, and to a newspaper editor in California who attempted to locate Mr. Hubbard through the state bar association and the police. She obtained replies from all these communications, but no information concerning her husband.

It further appears that Mr. Hubbard lived with his wife at the home of his wife's parents in Wilmette. The only child of the parties was a son born approximately two weeks prior to the date of the disappearance. In the evening of May 16th Mr. Hubbard appeared at the home of an acquaintance in Wilmette in an effort to have the acquaintance cash a check, which was refused. During the afternoon and evening of that day Mr. Hubbard incurred a taxi fare which he was unable to pay and as a result he was arrested and put in jail in Morton Grove, a suburb north of Chicago, where he spent that night. He was released the following morning but he did not return to his home nor communicate with his home.

On Monday, May 18th, he appeared at the office of a friend and classmate, Mr. Emil Levine, a practicing attorney in the city of Chicago. Mr. Levine was not in the office at the time and while waiting for him to return Mr. Hubbard took some blank checks out of Mr. Levine's checkbook and then left without awaiting Mr. Levine's return. Later in the day he appeared at the store of Morris L. Rothschild, a clothing merchant in Chicago, and purchased a new suit of clothes, a hat, and a shirt, and had them charged to his account. He changed his clothing at the store and had his old suit sent to his home. The following day, Tuesday, May 19th, he appeared at the Alpha Tau Omega fraternity house at Madison, Wisconsin, which was the college fraternity to which Mr. Hubbard belonged. He had forged the name of Mr. Levine on one of the blank checks which he had taken from Mr. Levine's checkbook, and sought to cash the check at the fraternity house, in the amount of $75. He was unable to get the check cashed at

the fraternity house, and then contacted a relative, one Milton Davidson, in Madison, and prevailed upon him to cash the check. The check was returned to Mr. Davidson marked "N. G." This check has not been made good.

On May 22, 1936, Mr. Hubbard registered at the Rosslyn Hotel in Los Angeles, and on that day contacted one John C. Mead, an attorney in Los Angeles and also a member of the same Alpha Tau Omega college fraternity, and sought to have him cash one of the checks which he had taken from Mr. Levine's checkbook and to which he had affixed Mr. Levine's signature in the amount of $75. Mr. Mead had his bank forward the check to the Chicago bank on which it was drawn to ascertain if it was authentic, and received word from the Chicago bank that the signature was forged. Mead communicated this to Mr. Hubbard and refused to cash the check. However, Mead did loan Mr. Hubbard $20 in order that Hubbard could pay a taxi fare which he had incurred the previous day, and to provide some pocket money. This occurred on or about May 26, 1936. No word or tidings had been received of or concerning Mr. Hubbard since that date.

During the period from August 30, 1935, to May 16, 1936, Mr. Hubbard indulged in excessive drinking, particularly on paydays. He would ordinarily not return home until he had spent all his money and would then return home in a taxi and the taxi fare would be paid by his family or his wife's parents. On various occasions he would stay out the entire night and not return home until some time the following day. On no previous occasion had he stayed away more than one night, and as far as it appears he had not previously spent the night in jail for failure to pay his taxi fare. Both his wife and his father-in-law had remonstrated with him about his drinking habits and told him that it would not only ruin him but his family as well, and he always promised that it would not happen again. Some time prior to May 16th he had been told

that he had been given his last chance. Except for the friction resulting from his drinking, the family life of the parties appeared to be normal.

Do the foregoing facts justify the finding of the jury that Mr. Hubbard, who disappeared from his home on or about May 16, 1936, died within approximately eight months and five days after the date of his disappearance? More than eight years expired between the time the insured was last seen in California and the date of the commencement of this action. There is no direct proof of Mr. Hubbard's death. The presumption of death which may arise from seven years' unexplained absence is not the prime issue, as none of the policies in question was in force at the end of the seven-year period. Consequently, the plaintiff had the burden of proving not only that the presumption of death from seven years' absence prevails, but also that death occurred within a comparatively short time after the insured's disappearance.

"The rule is well established in Wisconsin that while there is a presumption of death from the fact of an absence of seven years unexplained, there is no presumption as to when during the seven-year period the subject of inquiry actually died." *Kietzmann v. Northwestern Mut. Life Ins. Co.* 245 Wis. 165, 168, 13 N. W. (2d) 536.

Unless the facts and circumstances shown in any particular case are such as to warrant a reasonable inference that death took place at some particular time within the seven years, death is not presumed before the end of the period. *White v. Brotherhood of Locomotive Firemen,* 165 Wis. 418, 422, 162 N. W. 441; *Dobelin v. Ladies of the Maccabees of the World,* 171 Wis. 54, 57, 174 N. W. 897.

The instant case is ruled by the decision in the recent case of *Hogaboam v. Metropolitan Life Ins. Co.,* handed down January 8, 1946, *ante,* p. 146, 21 N. W. (2d) 268. Under the rule of that case, we must hold that there is no credible evidence

to sustain the jury's finding that Mr. Hubbard died some time between May 26, 1936, and February 1, 1937, inclusive. The facts in the instant case are less probative of the death of Mr. Hubbard within the period in question than were the facts in the *Hogaboam Case, supra.*

*By the Court.*—Judgment reversed. Cause remanded with directions to set aside the jury's answer to the first question of the special verdict and to enter judgment in favor of the defendant against the plaintiff dismissing the plaintiff's complaint, and for the costs and disbursements.