**Elwanda Bennett ARMSTRONG,
Plaintiff-Appellant,**

**v.**

**PILOT LIFE INSURANCE COMPANY,
Defendant-Appellee.**

**No. 82-171-II.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

April 7, 1983.

Application for Permission to Appeal
Denied by Supreme Court
July 25, 1983.

Charles W. Bone, David M. Amonette, and Burney T. Durham, Bone & Woods, Gallatin, Hal D. Hardin, Nashville, for plaintiff-appellant.

William F. Carpenter, Jr., Goodpasture, Carpenter & Woods, Robert E. Parker and Thomas W. Lawrence, Jr., Speight & Parker, Nashville, for defendant-appellee.

## OPINION

CONNER, Judge.

This case involves an effort by Elwanda Armstrong, plaintiff-appellant, the wife of a missing person, to have her husband, Robert Armstrong, declared legally dead so as to be able to collect as the beneficiary proceeds of a policy of insurance from Pilot Life Insurance Company, defendant-appellee.[1]

The chancellor after a bench trial found that the death of Mr. Armstrong had not been proved and Mrs. Armstrong appealed. In a broad attack on the decree she asserts that the evidence preponderated against the finding; and further that the chancellor erred:

(a) On various evidentiary rulings;

(b) In wrongfully denying her the opportunity to call a rebuttal witness;

(c) In giving credence to the testimony of defendant's witness because of prior contradictory testimony;

(d) In failing to re-open the proof based upon newly discovered evidence as to said witness, this being testimony given in a prior court proceeding, said to be contradictory at best and perjury at worst; and finally,

(e) in failing to apply the presumption of death after a disappearance of seven years which plaintiff contends is required under T.C.A. § 30–1801 et seq.

The plaintiff filed suit on August 11, 1980, seeking the proceeds of a $30,000.00 life insurance policy insuring the life of her said husband, Robert Armstrong, based upon his disappearance from his home in Hendersonville, Tennessee, on August 19, 1974, and his failure to return as of the date of trial. The complaint asked that Mr. Armstrong be declared to be deceased, pursuant to T.C.A. § 30–1801 et seq., and any pertinent common law principles.

Defendant answered with a general denial and specifically refuted plaintiff's right to rely on T.C.A. § 30–1801 et seq., since no facts were alleged to indicate the death of Robert Armstrong, and asserting that no presumption of death was created. The existence of the policy of insurance was admitted.

1. Hereinafter the parties will be referred to as in the trial court or by their names, as abbreviated.

The complaint was subsequently amended so as to seek a $7,500.00 penalty for defendant's alleged bad faith refusal to pay the claim pursuant to T.C.A. § 56–7–105.

The cause was tried non-jury on February 25, 1982.

At the conclusion thereof, the chancellor orally presented certain factual conclusions from the evidence which the court said were intended for the guidance of counsel in filing their conclusions of fact and law with the court. The chancellor designated these remarks as "a partial finding of fact" which served as his preliminary conclusions as to the preponderance of the evidence but invited counsel for both parties to brief the matter and to submit proposed findings of fact and conclusions of law.

Thereafter, while the chancellor had the case under advisement, plaintiff moved the court to consider certain newly-discovered evidence in the form of the transcript of *Green v. Green* (No. 68743, 4th Cir., Davidson County, Tenn.1976), a previous child custody proceeding in another court involving the minor child of one of defendant's principal witnesses, Wanda Green. The motion sought to reopen the plaintiff's case in rebuttal and to allow plaintiff to recall Mrs. Green, upon the theory that her testimony in the child custody proceeding was in contradiction to that in this cause entirely impeaching her credibility as a witness.

The court denied that motion, ruling that there was "no serious conflict" between the newly-discovered evidence and Mrs. Green's trial testimony; however, the trial judge ordered the transcript of *Green v. Green* admitted as evidence to be considered in arriving at final judgment and it is before us as part of the record.

On April 19, 1982, the chancellor filed his memorandum opinion in which he found for defendant, an order was filed and plaintiff appealed.

Based upon the proof adduced at trial the chancellor concluded:

"The defendant, Robert Charles Armstrong, prior to his disappearance on August 19, 1974, had worked at various jobs and immediately prior to his leaving the state was an agent for the Combine Insurance Company. The nature of employment required that he and a team of agents spend approximately one week in the various towns and cities in the Middle Tennessee area selling policies and collecting premiums from prior sales. The most convincing evidence establishes that approximately one month prior to August 19, 1974, he met and became romantically involved with a member of his sales team, namely Wanda Green. Robert Charles Armstrong and Ms. Green left their respective residents (sic) and traveled together from Tennessee to Arkansas and on to Texas. In early September, 1974, Ms. Green requested Robert Charles Armstrong to return to Tennessee with her, and when he refused, she returned without him. A few days after Ms. Green returned to Tennessee in early September, 1974, she talked with Robert Charles Armstrong on the telephone and after being told that she would not return to Texas, he reiterated his intention not to return to Tennessee and stated that he planned to 'disappear from the face of the earth'. Thereafter the plaintiff, Elwanda Bennett Armstrong, received credit card receipts for purchases in Arkansas, Texas and Louisiana dated in September and October, 1974, some of which were identified as being signed by Robert Charles Armstrong.

Sometime within the first few months after Robert Charles Armstrong left Nashville, Tennessee, Melody Armstrong, his daughter, told the plaintiff, Elwanda Bennett Armstrong, that she thought that she had seen Robert Charles Armstrong in a car on the street where they lived. The witnesses who testified at the trial had no knowledge of the activities or whereabouts of Robert Charles Armstrong since the use by him of his credit card in October, 1974, and the reported sighting of him by Melody Armstrong which occurred sometime before August 19, 1975. Prior to Robert Charles Armstrong's employment with Combine Insurance in the early '70s he worked with First American Oil Corporation in Texas investing in oil and as late as March 9, 1973, was engaged in correspondence with a Tex-

as company in regard to possible employment in the oil business.

After Robert Charles Armstrong left with Ms. Wanda Green on August 19, 1974, the plaintiff, Elwanda Bennett Armstrong, did not attempt to locate him and did not report his leaving and disappearance to the police until the summer of 1980. The plaintiff, Elwanda Bennett Armstrong, did not notify the defendant, Pilot Life Insurance Company, that Robert Charles Armstrong had left until August of 1980, nearly six years after he left and the same month that the policy expired. Mr. Kiger, the representative of the defendant, Pilot Life Insurance Company, interviewed the plaintiff, Elwanda Bennett Armstrong, in 1980 concerning the departure and absence of Robert Charles Armstrong. Mrs. Armstrong did not tell him of any problems in their family at the time of his departure. The evidence reveals that a mutually agreed fake divorce decree had been typed a short time before he left, which according to Mrs. Armstrong was for the purpose of misleading drug dealers, but according to Ms. Green was for the purpose of convincing girlfriends that he was not married. During this interview, Mrs. Armstrong did not tell Mr. Kiger of any drug involvement on the part of Robert Charles Armstrong, any perils or dangers believed to exist at the time he left or that she had been told by Mr. Robert Alexander, her husband's supervisor and by Mrs. Hellerman, Ms. Green's mother, that Robert Charles Armstrong had left Tennessee in August of 1974, with Ms. Green. Mrs. Armstrong told Mr. Kiger that she and her husband had a good relationship and had no problems and that if she had had any inkling that her husband had been unfaithful that she would have divorced him and set the house straight. At the time Mrs. Armstrong's deposition was taken on December 18, 1981, she testified that she knew of no reason why Robert Charles Armstrong would have left town with any other woman in August of 1974.

At the time Robert Charles Armstrong left Tennessee he was 39 or 40 years old and was in good health and appeared normal and in a good state of mind. He was the only son of an aged father who he apparently loved and he has made no attempt to contact. Robert Armstrong was the natural father of two minor daughters and the foster father of two sons. At the time of his disappearance, Robert Armstrong and Mrs. Armstrong jointly owned property and there was no evidence to indicate any abnormal financial problems. The preponderance of the proof establishes that his departure and absence was voluntary, intentional and planned. The Court finds that he left his family, church, and job as a result of his attraction to a woman, and not because of any fear of harm or death to himself or to his family. Mr. Armstrong was an active member of the Church of Christ and had apparently concealed his infidelity from the church and immediate community up until the time of his disappearance. The Court can readily understand that a person leaving all of these wholesome activities and accomplishments would be very reluctant to return to the people that he had abused and disappointed.

The witness, Wanda Green, was twenty-one years of age with a four year old child and obviously experienced beyond her years. It would have to be conceded that her life style at that time did not indicate a naive young woman. The Court does not find, however, that her questionable personal life is sufficient to discredit her testimony. Her testimony was convincing on the date of the hearing and she appeared to be a frank and truthful witness who had nothing to gain. There were no serious discrepancies between her testimony given in the child custody hearing in Davidson County and that submitted to this Court on February 25, 1982.

The plaintiff insists that Section 30–1802(1) T.C.A. provides that the presumption of death is not so conclusive that it requires the Court or jury to find that the absentee is deceased and did not abolish the rebuttal presumption of death. She insists that the statute provides that the party denying death must overcome the presumption by submitting evidence that the absentee is alive, and only repeals the common

law regarding presumption of death. It is her position that the evidence presented does not have to be to the extent that the Court be freed from any doubt, suspense or uncertainty, but only a preponderance of the evidence is required on which to base a verdict. The plaintiff insists that it is the duty of the defendant to show by an affirmative defense by a preponderance of the evidence that Robert Armstrong is alive. The defendant insurance company insists that it is the duty of the plaintiff to prove by a preponderance of the evidence that Robert Charles Armstrong is dead and that his death occurred before the policy expired on August 12, 1980.

The Court must determine the issue of death upon the preponderance of the evidence submitted at the trial and not merely the presumption of death arising from the absence of Mr. Armstrong for a period of seven years. The Court as it stated at the conclusion of the hearing on February 25, 1982, does not find any credence in the plaintiff's theory that Mr. Armstrong was involved in any dangerous activities as a federal or state undercover drug agent. The Court feels that the evidence submitted to this effect was simply statements made to his trusting family in order to mislead them as far as his extramarital activities were concerned. It must, after reaching this determination, consider whether the actions of Mr. Armstrong in leaving the state with his girlfriend and being absent for the seven year period is sufficient to satisfy the requirements of Section 30–1802(2) T.C.A. The Court must consider all the circumstances relative to the absentee's departure, as well as circumstances existing during his absence, and any reason he may have had to remain gone. It is difficult to realize or to understand how any one individual could absence (sic) himself for a period of seven years with all the modern communications, transportation, computers, governmental records, including finger printing and Social Security reports, etc.

The Court cannot, however, by its interpretation of the statute presume his death simply because he has been missing seven years. It can understand Mr. Armstrong's state of mind and the humiliation, shame and embarrassment that would confront him if he had returned in a reasonable time after his disappearance. The Court can further understand that Mr. Armstrong could have been very hurt and depressed over the rejection by his girlfriend especially after deserting his family over his love for this woman. It is possible that a person in such a desparate state could consider suicide, but this is not the type peril as intended by the legislative act in question.

There is nothing in the record to convince the Court that his life was in danger during his absence to the extent of satisfying the provisions of Section 30–1802(2). It is with much reluctance that the Court finds that the plaintiff has failed to establish by a preponderance of the evidence that her husband, Robert Armstrong, is deceased. It is, therefore, the finding of the Court that her petition must be dismissed. . . . "

Plaintiff earnestly contends that these findings are not supported by the proof and in any event that the evidence viewed in the light most favorable to the insurer is insufficient to overcome the common law presumption of death after seven years absence which Mrs. Armstrong contends is still viable in Tennessee.

We believe we must deal with this issue first because if the common law presumption of death does indeed still exist we are satisfied that the defendant's proof is insufficient to overcome it. If, however, no such presumption remains, the quality of defendant's proof tested in light of the chancellor's findings of fact and the weight to which these findings are entitled is another matter.

Prior to 1941, the common law of Tennessee required a rebuttable presumption of death emanating from the fact that a person had been missing and not heard from for a period of seven years from the date of disappearance, and that a diligent but futile search for the party had been attempted. *See*, e.g., *Puckett v. State*, 33 Tenn. (1 Sneed) 355 (1853); *Dushan v. Metropolitan Life Insurance Co.*, 4 Tenn.App. 614 (1926);

*Redwine v. Metropolitan Life Insurance Company,* 178 Tenn. 83, 156 S.W.2d 389 (1941); Caruthers, *History of a Lawsuit* § 333 p. 382 (Gilreath 8th ed. 1963).

But in that year the legislature passed a version of the "Uniform Absence as Evidence of Death and Absentees' Property Law," T.C.A. § 30–1801 et seq. The provision pertinent to our inquiry, T.C.A. § 30–1802, reads:

*No presumption of death from mere absence—Exposure to specific peril considered—Distribution of funds of absentee.*—(1) Death not to be presumed from mere absence. In any proceeding under this chapter where the death of a person and the date thereof, or either, is in issue, the fact that he has been absent from his place of residence, unheard of for seven (7) years, or for any other period, creates no presumption requiring the court or the jury to find that he is now deceased. The issue shall go to the court or jury as one of fact to be determined upon the evidence.

(2) Exposure to specific peril to be considered in every case. If during such absence the person has been exposed to a specific peril of death, this fact shall be considered by the court, *or if there be a jury, shall be sufficient evidence for submission to the jury.*

In the event there are now or shall hereafter come into the hands of the clerks of the respective courts of record of this state and/or into the hands of administrators or executors any funds belonging to such absentee and such absentee has been unheard of for a period of seven (7) years prior to the time that such funds belonging to the absentee came into the hands of such clerks of said courts or administrators and/or executors, and, after diligent inquiry, remains unheard of, such absentee shall be presumed to be dead and such funds shall descend to the next of kin of the said absentee under the law of distribution of personalty, if personalty; and, if arising

from the proceeds of the sale of land, to the heirs at law under the law of descent and distribution and be paid upon the order of a court of record.

This appeal represents a case of first impression on the meaning of this legislation.

Our statute, though not a precise copy thereof, is based on a 1939 model act proposed by the National Conference of Commissioners on Uniform Law. 8 National Conference of Commissioners on Uniform Law, *Uniform Laws Annotated* 4 (Master ed. 1972), (hereinafter cited as U.L.A.). Since its proposal, three states have adopted different versions of the law: Maryland, Wisconsin and Tennessee. 8 U.L.A. 1. Maryland has since repealed its "Uniform Law."[2] Maryland originally adopted the Uniform Act, but subsequently repealed it, replacing the Uniform Act with one containing similar provisions and the same general purpose. 8 U.L.A. 1 (Supp.1983). Wisconsin adopted the Model Law,[3] but substantially modified the proposed legislation prior to enactment. The Wisconsin legislature excluded the first section of the Uniform Act. *See Wisc.Stat.Ann.* § 813.22 et seq. Thereafter, the Wisconsin Supreme Court continued to recognize that the common law presumption of death from an absence of seven years still existed in that state. *See Hubbard v. Equitable Life Assurance Society,* 248 Wis. 340, 21 N.W.2d 665 (1946).

The subject rule traces back to the English common law, and in Anglo-Saxon jurisprudence it was almost universally held or provided by statute that a presumption of death arose from a person's absence for a seven year period. 1 *Jones on Evidence* § 3.85 p. 306 (A. Gard 6th ed. 1972). Plaintiff submits that when the Tennessee legislature adopted the Uniform Law in 1941, and amended it in 1949, the presumption of death from a person's seven year absence was specifically retained. Pilot Life says otherwise.

**2.** 1973 Wis.Laws ch. 2 § 2.

**3.** *Wis.Stat.Ann.* §§ 813.22 to 813.34 (West).

Mrs. Armstrong contends that T.C.A. § 30–1802(1), *supra,* only provides that the presumption of death is not an irrebuttable one *requiring* the trier to find that an absentee is deceased. This argument is premised on the theory that under ancient law the trier of fact was sometimes forced to conclusively presume that the lost person was dead. Plaintiff asserts that this led to unjust results in cases where the absentee was missing for the seven year period while other evidence showed that the absentee was alive. She cites *McCormick on Evidence* which reviews the early statutes eventually resulting in the common law seven year presumption of death. McCormick traces this presumption back to the Bigamy Act of 1604 and from a statute in 1667 which provided:

> ... "in the case of estates and leases depending upon the life a person who should go beyond the seas, or otherwise absent himself within the kingdom for seven years, that where the lessor or reversioner should bring an action to recover the estate, the person thus absenting himself should 'be accounted as naturally dead,' if there should be no 'sufficient and evident proof of the life,' and that the judge should 'direct the jury to give their verdict as if the person ... were dead.' "

*McCormick on Evidence* § 343 p. 809 n. 64 (E. Cleary 2d ed. 1972).

Based on this authority plaintiff concludes that under the early common law, the trier of fact had to sometimes conclusively presume that the absentee was dead, though the cited statute speaks of the need for "sufficient and evident proof of the life" before the trier of fact to prevent a finding of death which seems to us to be "rebuttable presumption" language. In any event, Mrs. Armstrong argues that the Tennessee legislature sought to avoid this result stating that a seven year absence "creates no presumption *requiring* the court or the jury to find that [the absentee] is so deceased." She asserts this language is intended to make an otherwise conclusive presumption rebuttable.

Plaintiff submits that when the legislature considered the proposed draft of the Uniform Law as originally written, it determined that the suggested legislation was not compatible with Tennessee law because it appeared to abolish any presumption of death. She reasons that to prevent this possibility, the legislature added a paragraph to the commissioner's draft which explicitly incorporated the use of the presumption. The legislature placed this paragraph into the section of the law which is applicable to suits against life insurance companies. In the original legislation the provision is entitled "Insurance Policy Provisions Invalid." It states:

> *Provided,* that if the seven year absence *is relied upon to establish death,* then the statutory period of limitations shall only commence to run at the end of the seven years. (Emphasis supplied.)

T.C.A. § 30–1803(2).

In plaintiff's view this paragraph, not contained in any other version of the Model Act, evidences the fact that the legislature did not intend to eliminate the use of a presumption of death. Mrs. Armstrong argues that the quoted language clearly states that the seven year absence can be relied upon to *establish* death. If absence alone can *establish* death, she reasons the legislature must have considered the absence more than just evidence of death and intended to retain the presumption. There is no legislative history before us in this regard.

It is true that some commentators who have written about the seven year presumption of death after the passage of the Uniform Law appear to recognize its continued existence.

> When a person has been absent from his domicile, or his last place of residence, for seven years and has not been heard from during that time, he is presumed to be dead. ...

Lee, *Tennessee Evidence* § 27 p. 16 (1949). This work, written eight years after the passage of the statute, specifically states that the presumption of death continues to exist in Tennessee.

Another authority which at first sight appears to concur with the conclusion that a presumption of death exists after the passage of the Uniform Law is Caruthers, *History of a Lawsuit.* Both the seventh edition, written in 1951, and the eighth edition, written in 1963, state that:

> ... When a person has been absent from home for seven years and has not been heard from by those who naturally would have heard from him if he were alive, he is presumed to be dead....

Caruthers, *History of a Lawsuit,* § 333, p. 369 (Gilreath 7th ed. 1951) and § 333, p. 382 (Gilreath 8th ed. 1963). However, in a footnote the author indicates that the statute is contrary to the above quoted text by stating: "*But see* T.C.A. §§ 30–1801 to 30–1815." *Id.* at 383 n. 13. Obviously, Caruthers views the statute and case law to be in conflict.

On the other hand, defendant argues and the chancellor found that the uniform statute, as adopted by Tennessee, according to its express language, now permits a period of absence, for seven or any other number of years, to be considered with all other circumstantial evidence to determine whether by a preponderance of the evidence the absentee is deceased. The defendant reasons that no presumption survived the Uniform Law except the common law presumption of life that once it is established that the absentee is alive, he is presumed to still be alive unless proved to be dead. *Grier v. Canada,* 119 Tenn. 17, 107 S.W. 970 (1907); *see also* 44 Am.Jur.2d *Insurance* § 1971 p. 916 (1969). Consequently, the burden of proof of death is on the plaintiff as the party who would benefit from the absentee's death. We agree with the interpretation given the statutory scheme by the defendant and the chancellor.

We believe that from the plain language of the statute as well as from the statutory scheme of the entire act that the legislature intended to change the common law rule.

First, T.C.A. § 30–1802 states in its caption, "No presumption of death from mere absence," and in sub-caption (1), "Death not to be presumed from mere absence." This section then specifically states that the absentee's absence for seven years or some other period of time "creates *no presumption* requiring the court or the jury to find that he is now deceased." Since there is no longer a presumption of death as a result of this language, the legislation provides in an orderly fashion that the issue of death "shall go to the court or jury as one of fact to be determined upon the evidence." T.C.A. § 30–1802(1), *supra.* Moreover, in seeking to carry its burden of proof, plaintiff under § 30–1802(2) may at least get his or her case submitted to the jury if it can be shown that the absentee was exposed to some specific peril.

We believe the statutory scheme of the Uniform Act as adopted in Tennessee is also important, as it appears to us that the law is essentially divided into two parts so as to aid the courts in disposing of both (1) the personal property of the absentee and (2) the proceeds of any insurance on the life of the missing person after proof of his or her death.

The distinction between the absentee's personalty on one hand, and the proceeds of a life insurance policy on the other, is consistently carried throughout the Uniform Act as adopted in Tennessee. The separation is implied from the caption of the Act ("Uniform Absence as Evidence of Death *and* Absentee's Property Law") and is noted in the third paragraph of T.C.A. § 30–1802. There the legislature permitted the rebuttable presumption of death to remain in effect for purposes of distributing the funds and other personalty of the absentee coming into the hands of court clerks, administrators and executors after the person has been missing for seven years.

Plaintiff argues that this paragraph, added in 1949, reinstates the rebuttable presumption for all purposes. We cannot agree and find various commentators on the Uniform Act to be in accord with our view. In *Tennessee Law of Evidence,* § 246 p. 268 (1974), Professor Paine, a learned authority, asserts that the act abolishes the presumption of death, and adds that:

... however, a presumption is established *for the limited purpose* of enabling executors and administrators to distribute funds after this period, with a percentage of the funds being set aside to the state treasurer for reimbursement of appearing absentees.... (Emphasis supplied.)

In the Tennessee Law Review it is likewise stated that the Uniform Act abolished the presumption of death, but was:

> ... amended in 1949 to provide for a presumption of death for purposes of descent and distribution of property in the hands of a court of record, administrators, or executors of any fund, after seven years of unexplained absence.

Comment, *Tennessee and the Uniform Acts,* 22 Tenn.L.Rev. 407, 411 (1952); *see also* 2 *Pritchard on the Law of Wills* § 865, p. 415 (Phillips 3rd ed. 1955), noting that the common law presumption was "restored in certain situations" by the 1949 amendment, and the pointed discussion of the distinction in 9 Wigmore, *Evidence* § 2531b (Chadbourne rev. ed. 1981). This distinction appears reasonable to us. Apparently, the legislature intended to clarify the method of distributing the existing property of a person missing for seven years, but determined that such a procedure was not necessary for life insurance proceeds to which the absentee's beneficiary had no right until proof of the insured's death.

In all sections of the Uniform Act dealing with the proceeds of life insurance policies, other than the last paragraph of T.C.A. § 30–1803, the absence of the insured is referred to specifically as mere evidence of death, not in any fashion that could be construed as a presumption of death.

▇ The interpretation of this statute by the chancellor comports with long-recognized rules of statutory construction in Tennessee law. The plain and ordinary language of the caption and text of the statute states that the presumption of death has been abolished. In *Oliver v. King,* 612

S.W.2d 152 (Tenn.1981), the supreme court ruled that:

> ... Legislative intent and purpose is to be ascertained primarily from the natural and ordinary meaning of the language used, when read in the context of the entire act or statute, without any forced or subtle construction to limit or expend the import of that language....

*Id.* at 153. Moreover, the supreme court has specifically held that the caption of the legislative enactment is evidence of legislative intent:

> In the construction of a statute we must seek to ascertain the intention of the Legislature as it is expressed in the words of the statute and should look to the entire Act and give consideration to the purpose, objective and spirit behind the legislation. The caption of the act and the policy statement ... provide the objective and spirit of the Act....

*Dorrier v. Dark,* 537 S.W.2d 888, 892 (Tenn. 1976). Both the caption and sub-caption of T.C.A. § 30–1802 indicate as clearly as words will allow that the presumption of death from a seven year absence has been abolished.

The legislature likewise adopted the caption of the Uniform Act as part of the bill passed in 1941:

> *An Act providing for evidential effect of absence as evidence of death* and for the disposition of property of absentees unheard of for a period of years and to make uniform law with reference thereto.[4] (Emphasis supplied.)

This caption or preamble refers to absence as "evidence of death," not a presumption of death. If the legislature had intended the Uniform Act to merely codify the common law rule providing for such a presumption, we believe it would have so stated.

A majority of the legal scholars who have dealt with the subject believe the presumption to have been legislatively repealed.

---

4. *See* Uniform Absence as Evidence of Death and Absentees' Property Act, 8 U.L.A. 5 (1972) and Public Acts of 1941, Ch. 102.

In the latest printing of *Gibson's Suits in Chancery* Chancellor Inman excludes any reference to the common law presumption and states in the absolute:

> ... Contrary to former, long accepted policy, there is no longer a presumption of death after an absence of seven years. T.C.A. 30–1802.

*Gibson's Suits in Chancery* § 191 p. 188 n. 25 (Inman 6th ed. 1982). In Paine, *Tennessee Law of Evidence, supra,* the author writes with equal firmness:

> At common law there was a presumption that a person who had been absent without tidings for seven years was dead. Tennessee has changed this presumption by adopting a modified version of Uniform Absence as Evidence of Death and Absentees' Property Law. This statute provides that, while the seven-year period can still be *evidence* of death, the jury is not required to *presume* death from this time lapse.... (Emphasis in original.)

*Id.* at § 246 p. 268. In an article entitled "Tennessee and the Uniform Acts" the writer asserts that the Uniform Act as adopted in Tennessee:

> ... removes the presumption of death which at common law followed a seven year unexplained absence....

22 Tenn.L.Rev. at 411. To the same end Judge Phillips in his treatise wrote that:

> As originally enacted the act provided that death is not to be presumed from mere absence....

2 *Pritchard on the Law of Wills* § 865 p. 415 (Phillips 3rd ed. 1955); *see also McCormick on Evidence* § 343 (Cleary 2nd ed. 1972), and the excellent discussion of this issue and the Uniform Act in 9 Wigmore, *Evidence* § 2531b p. 613–16 (Chadbourne rev. ed. 1981).

Plaintiff strenuously asserts that the language of T.C.A. § 30–1802 merely adopts the common law rule and that, by providing that a period of absence "creates no presumption requiring the court" to find the absentee deceased, the legislature was making certain that absence did not create an irrebuttable presumption. This is a *non sequitur* to us because the presumption in Tennessee was already a rebuttable one, making it unnecessary for the legislature to recreate it by codification and making unnecessary any explicit distinction from an irrebuttable presumption. Had the Tennessee legislature wanted to maintain the common law presumption, it could have followed the lead of Wisconsin and omitted the first section of the Uniform Act.

Finally, while there is no existing legislative history *per se* as to the adoption of the Uniform Act in Tennessee we believe that the General Assembly would have surely been made aware of the "Commissioners' Prefatory Note" accompanying the Uniform Act as originally passed by the National Conference of Commissioners on Uniform State Laws and the American Bar Association in 1939. This "Note" which sets forth the purpose of the Act makes abundantly clear that its purpose was to eliminate the presumption of death, whether it be rebuttable or otherwise. *See* 8 U.L.A. 1, *supra; see also* 2 *Pritchard on the Law of Wills, supra* at § 864.

We hold that T.C.A. § 30–1801 et seq., expressly modifies the common law rule by abolishing the seven year presumption of death.

We now turn to plaintiff's contention that the evidence preponderates against the finding. It is fundamental that the findings of the chancellor are entitled to the presumption of correctness contained in T.R.A.P. 13(d). Moreover, any conflict in testimony requiring a determination of the credibility of witnesses is for the trial court and is binding on the reviewing court unless other real evidence compels a contrary conclusion. *State ex rel. Balsinger v. Town of Madisonville,* 222 Tenn. 272, 282, 435 S.W.2d 803, 807 (1968).

With respect to the standard of review of a trial court's finding which is based upon conflicting oral testimony, this court has stated:

> Of course, this appeal brings the case to us for review de novo ... accompanied by the usual presumption that the decree of the trial Court is correct unless the

preponderance of evidence is otherwise. This presumption of correctness is entitled to more than the usual indulgence since the case was tried upon oral testimony, thus giving the Chancellor an opportunity, which we do not have, to observe the manner and demeanor of the witnesses while testifying before him and to determine which way the evidence preponderated.

It has been held, both by the Supreme Court and this Court, that where a case is tried without intervention of a jury, upon oral testimony, the trial Judge's finding of fact dependent upon the credibility of the witnesses is entitled to great weight. (Citations omitted.)

*Capital City Bank v. Baker*, 59 Tenn.App. 477, 493, 442 S.W.2d 259, 266 (1969).

The primary question in this case was why did Mr. Armstrong disappear? The plaintiff's theory is that Mr. Armstrong was so deeply involved as an undercover drug agent that he could not extricate himself and that his life and the safety of his family were consequently in danger or alternatively, that he was deranged. In essence, plaintiff's theory is that Mr. Armstrong disappeared to save his family from harm and was killed by those who had allegedly made threats against his life, or in the alternative, that he became so concerned and depressed about his predicament, whether real or imagined, that he committed suicide. Of course, these theories are in and of themselves somewhat inconsistent which lends crudility to defendant's argument that both theories are speculative at best.

Defendant's view of the disappearance is that Mr. Armstrong was involved with other women behind the facade of a wholesome, church-oriented family life; that he used the ruse of "undercover drug" activity to hide his extra-marital adventures from his family; that he ultimately ran away with Mrs. Green; and that due to the guilt and humiliation associated with deserting his family, friends and church, was unable to return and face them.

In summary, the chancellor had before him three theories of Mr. Armstrong's dis-

appearance, and found that by the preponderance of the evidence, Mr. Armstrong was not murdered, nor did he take his own life, but instead, left with another woman and cut all ties with his former world in Tennessee. Though reachable, this conclusion is not without some speculation because in truth from this proof no one really knows whether Mr. Armstrong is living or dead and actually why he disappeared.

It is true that this record contains substantial evidence of Mr. Armstrong's proclivities for extramarital activity. The testimony of Mrs. Green as to her romantic interlude with Mr. Armstrong speaks for itself. Moreover, Mrs. Green recalled that Mr. Armstrong had told her about a previous love affair with a woman identified only as "Susan." The seriousness of the relationship between Mrs. Green and Mr. Armstrong was summarized by her testimony that:

> ... he talked about getting married and even wanting me to get pregnant.
>
> He wanted a future and a family and I thought that was his motive and maybe it wasn't but that's what I thought. That was my feeling in the matter. That's what I was doing with him. It wasn't just, you know, a lark or anything to me.

Numerous different women called the plaintiff prior to her husband's decision to leave home. On one of these occasions Mr. Armstrong even phoned his wife first to warn her that a woman was about to call and not to let it "shake" her. When the woman did telephone, she told plaintiff that she was "some sharp red-headed chick that knew Bob" and "you better come over and have him checked out, honey." On another occasion a woman called to tell plaintiff she was going to "plant something on him and we'll embarrass him and get him taken care of."

There was ample evidence to support the chancellor's conclusion that Mr. Armstrong was involved with other women and that he was losing interest in his family.

On the other side of the fence, the chancellor indicated that much if not most of the evidence relating to Mr. Armstrong's in-

volvement with the drug underworld, as testified to by plaintiff, her daughters, her foster son and Roger Alexander, Mr. Armstrong's superior at work, was not evidence personally known to them. Rather, it was told to them by Mr. Armstrong himself.

No one outside the family and employer circle testified as to any direct personal knowledge of Mr. Armstrong's involvement in the drug underworld. No specific instances of drug activity were noted. Nor was any one available person identified who could unquestionably connect Mr. Armstrong with such activity at any time in his life. Plaintiff relied heavily upon the testimony of Mr. Alexander. However, the employer's knowledge also resulted solely from a single discussion with his employee when Mr. Armstrong was trying to explain why he had without notice missed two days of work. Mr. Alexander also testified that he talked with Mrs. Green after she returned to Nashville from Texas, and that she told him Mr. Armstrong, while in Texas, had met some "foreign-type" people who drove big cars and were "flashy." However, he did not say Mrs. Green told him anything about drug activity, and, in fact, testified that these people were in "the car business" and that Mr. Armstrong was working with them as a salesperson. Mrs. Green herself denied ever making such a statement to Mr. Alexander, and further testified that Mr. Armstrong never said anything to her about drugs except early in their relationship when he indicated he had some marijuana.

Plaintiff relies strongly on Mr. Armstrong's telling his family in advance of things that would occur "in the drug scene" which later became reality. However, the statements in this record were far too general to indicate a specific knowledge of when a given "drug bust" would occur. Accordingly, we can give them no more credence than did the trial judge.

The chancellor observed that the odd behavior of Mr. Armstrong prior to his departure with Mrs. Green, and some of the unusual events occurring with his family during that time, indicated a pattern not uncommon to the life of a man involved in extramarital affairs. The court reasoned:

They [the family] have testified to various things they saw and observed in addition to his statement such as people watching the home, following the automobile, telephone calls, unexplained nervousness and things of that nature.

A lot of intrigue involved in that theory. Similar to a James Bond movie or something of that nature. A lot of intrigue as to the drug involvement and primarily that was all from statements to this fine family.

Now, the Court doesn't know if Mr. Armstrong had an uncontrollable imagination, looked at too many television shows or what, or whether he was sincere and actually did act as an undercover agent for some federal agency that he did not see fit to divulge to members of his family. Or whether this strange behavior, telephone calls or watching the home, disappearances on various occasions, whether that was connected with his relationship with some woman or Miss Green, Miss Green in particular.

But the pattern would not be unusual for a person involved with another woman that's married. . . .

. . . . .

But the position as to the reason and the watching, the factors involved with the mystery surrounding the home there could very well be with involvement with other women.

Following the car is not unusual, I found out in divorce cases, telephone calls, two rings and hanging up, jealous girlfriend watching the home, watching the automobile wherever it goes. All of those factors are not unusual.

Other conduct of this nature exhibited by Mr. Armstrong was checking into two motels in a given night. The plaintiff herself thought it was "odd" and it made her "really . . . irritated" because she was paying the lodging bills.

Not only did the chancellor find that Mr. Armstrong left his wife because of his af-

fection for Mrs. Green, he also found that the conflict between Mr. Armstrong's strong religious background combined with his infidelity had produced a guilt that made his return to Tennessee impossible. The chancellor ultimately concluded:

> ... The preponderance of the proof establishes that his departure and absence was voluntary, intentional and planned. The Court finds that he left his family, church, and job as a result of his attraction to a woman, and not because of any fear of harm or death to himself or to his family. Mr. Armstrong was an active member of the Church of Christ and had apparently concealed his infidelity from the church and immediate community up until the time of his disappearance. The Court can readily understand that a person leaving all of these wholesome activities and accomplishments would be very reluctant to return to the people that he had abused and disappointed.

The thrust of the chancellor's judgment was that the same evidence presented by plaintiff tending to show Mr. Armstrong's efforts to cover his alleged drug activities also supported his actual intent to conceal his extramarital activities.

Additional probative evidence of this dual use of his cover devices found by the court to be a ruse were the preparation of a bogus divorce decree and his telling plaintiff that he might have to run away with Mrs. Green to protect the family because of his drug involvement. According to Mrs. Armstrong, the make-believe divorce decree was prepared and left in conspicuous places in their home so that "burglars" from Mr. Armstrong's drug world, upon forced entry therein, would determine that Mr. Armstrong did not care for his family; and thus, his enemies would not harm them. In contrast to this novel explanation Mrs. Green testified that Mr. Armstrong used these "divorce documents" to enhance his relationships with other women, and, in fact, used the fake decree with her to "prove" he was not married. His statement to plaintiff about the necessity of leaving

with Mrs. Green, viewed from the hindsight of actual events and Mrs. Green's testimony in regard thereto, is substantial evidence that Mr. Armstrong did indeed fabricate his drug involvement to clear the way for his sudden departure with Mrs. Green by eliminating any concern for his immediate whereabouts.

In further justification of the finding, the chancellor noted that the plaintiff made no real effort to find her own husband until at least six years after he disappeared. She never did contact the police. Her trial explanation that she was not worried because she knew he had gone, as planned, with Mrs. Green, was weakened by her discovery deposition testimony that she knew of no reason why her husband would have left town with another woman.

The plaintiff knew or certainly should have known shortly after her husband's disappearance that he had gone away with Mrs. Green, a fact told to her by Mr. Alexander and Mrs. Green's mother. At neither her original interview with defendant's investigator, Joel Keiger, nor her discovery deposition, did the plaintiff disclose that this information had been revealed to her. Though having been told of Mrs. Green's involvement with her husband and that Mrs. Green had returned to Nashville, Mrs. Armstrong never even talked to the woman concerning the matter.

When Mr. Keiger visited her to obtain the basis for the claim and to try to locate Mr. Armstrong, she also failed to voluntarily disclose to him the unusual circumstances of their family life centered around her husband's alleged drug involvement, threats, unusual behavior, surveillance, false divorce papers, telephone calls from strange women and the like.

In contrast to this proof with some obvious deficiencies the chancellor found Mrs. Green's testimony to be "convincing on the date of the hearing and she appeared to be a frank and truthful witness who had nothing to gain."

No doubt there are discrepancies between her previous testimony given in the custody proceeding and this trial regarding the trip

to Texas. This is most obvious in the differing versions of when during the events her participation became involuntary. However, on the critical questions to this litigation of whether they went together to Texas and what Mr. Armstrong's feelings and intentions were toward her, the testimony was consistent. Beyond peradventure Mr. Armstrong left for Texas with Mrs. Green and her child with the appearance of great affection and the apparent hope and intention of starting a new life with them.

As we have previously noted, the chancellor's determination of the credibility of witnesses is not here subject to review by us. There is substantial evidence in this record from which the chancellor could reject portions of plaintiff's testimony (or at least her interpretation of events) which conflicted with defendant's proof and to believe the testimony of Mrs. Green. In fact, there are portions of plaintiff's proof which would be difficult to analyze as she suggests under any circumstances.

■ Beyond this, our ultimate problem with plaintiff's preponderance of the evidence complaint is not that Mr. Armstrong could not be dead. No doubt he very well could be, either from drug involvement or from lunacy as Mrs. Armstrong suggests; or for that matter from a disenchanted lover as defendant's proof might indicate, or even natural causes. However, based on this proof, it is at least equally as probable that he is still among the living with a new identity. And absent a presumption of death we are unable to say that the conclusion of the chancellor was erroneous. In candor, based on our review of this record the very best that can be said of the evidence in plaintiff's behalf is that it does not preponderate either way even if we view it in the form desired by plaintiff. Therefore, plaintiff must fail under existing law in Tennessee.

This being the case we find that any error which might be present in the chancellor's rulings allowing the introduction of the two letters claimed by plaintiff to be inadmissible hearsay, plaintiff's aborted efforts to present a rebuttal witness at the conclusion of defendant's case, and plaintiff's effort to reopen the proof on the basis of newly discovered evidence of prior contradictory testimony of Mrs. Green, is harmless. T.R.A.P. 36(b). We reach this conclusion after discounting to the extent allowed by law the effect of each of these alleged errors about which plaintiff complains. We elaborate.

■ We first deal with the copies of letters regarding possible employment in Texas which the chancellor allowed in evidence over plaintiff's objection as to lack of authenticity. We assume *arguendo* that there was an insufficient foundation laid and that the copies of the letters should not have been admitted. However, these letters had little, if any, probative value in the matter. Pilot Life did not seriously contend, nor did the chancellor find, that this is why Mr. Armstrong went to Texas. In fact, it is contrary to the express testimony of the one person available at trial to speak first hand about the "trail to Texas," Mrs. Green. We cannot agree with Mrs. Armstrong's contention that without the admissibility of these documents the case of Pilot Life is "fundamentally undermined." Accordingly, we hold that any error in this regard was clearly harmless. T.R.A.P. 36(b).

■ Finally, we deal with plaintiff's aborted efforts to impeach Mrs. Green, either through putting on in rebuttal her sister to testify that she was a liar, or by re-examining Mrs. Green regarding her prior testimony. As to the former approach, plaintiff has a procedural problem in that the only record which has been authenticated as entirely accurate reflects that when asked by the chancellor if plaintiff desired to submit rebuttal proof, counsel responded: "No, your honor." Granted that plaintiff filed an "Addendum to Proceedings" which contained two different versions of what occurred between the court and counsel regarding the calling of the rebuttal witness which the reporter thought was "off the record" and did not transcribe. As reflected therein plaintiff's counsel recalled a

specific request to present rebuttal which was overruled. Defendant's counsel recollected "plaintiff's counsel stating there was a possibility that he might want to recall Mrs. Green's sister to attack her credibility" the next day. However, the court did not select which version to adopt. Certainly, we cannot here attempt to do so. It appears that plaintiff would have been allowed to present the rebuttal proof on that day and that whatever resistance offered to the chancellor's unwillingness to hear her on the morrow was minimal. More importantly, even if the sister had been called and had testified as to Mrs. Green's propensities to take liberty with the truth, it still would not have affected the inescapable fact that Mr. Armstrong left his family and took Mrs. Green and her child to Texas. Mr. Armstrong's employer, *Roger Alexander,* knew that as a fact because he actually recouped from Mrs. Green work materials of Mr. Armstrong's which he sent back to the employer by her. Finally, Mrs. Armstrong should have known beyond reasonable doubt what had transpired after her first conversation with Mr. Alexander subsequent to his visit with Mrs. Green upon her return and/or her conversation with Mrs. Green's mother. Yet incredibly, Mrs. Armstrong chose to ignore the realities of this situation even through trial.

As stated in *Johns v. Caldwell,* 601 S.W.2d 37, 44 (Tenn.App.1980):

> The Trial Court has wide discretion in matters of this nature and the ruling of the Trial Court with respect to additional proof will not be disturbed on appeal unless there has been an abuse of discretion. . . .

■ For much the same reasons the chancellor's failure to reopen the proof is not cause for reversal. First, as with the conduct of the trial itself, the chancellor has wide discretion on such requests. *See Higgins v. Steide,* 47 Tenn.App. 42, 335 S.W.2d 533 (1959). The chancellor did consider the testimony some of which was indeed inconsistent, but much of which was not. Further, even if Mrs. Green's separate courtroom versions were hopelessly in conflict this would not render the latter testimony incapable of any consideration as Mrs. Armstrong contends. This rule has only been applied when the diametrically opposed versions are given in the same proceeding. *See Taylor v. Nashville Banner Publishing Co.,* 573 S.W.2d 476, 482–83 (Tenn.App. 1978), *cert. denied* (Tenn.1978), *cert. denied* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 397 (1979); *see also Bowers v. Potts,* 617 S.W.2d 149, 154–55 (Tenn.App.1981), and cases cited therein. Moreover, on the critical questions of whether she left for Texas with Mr. Armstrong and what were his inclinations there is no material variance. In the area where the testimony is in conflict, regarding the voluntariness of her journey, we believe the chancellor had the right to consider the circumstances of the first trial. There Mrs. Green was locked in a desperate struggle for custody of the only offspring she would ever bear. This being the case when this episode was brought up therein it was neither unnatural to the trial judge nor us that she would paint the circumstances of her departure in the light most favorable to her. However, that does not significantly detract from the overwhelming proof that Mrs. Green went to Texas with Mrs. Armstrong and that as a result he evidenced no intent to return to Middle Tennessee.

We are sympathetic to Mrs. Armstrong's plight. Should some real proof come to her attention that Mr. Armstrong is indeed deceased and that his demise occurred during the policy term she should be entitled to further pursue collection of the proceeds thereof. However, under existing law, plaintiff's existing case is now insufficient. Accordingly, this cause is affirmed and remanded. The costs are taxed against Mrs. Armstrong.

AFFIRMED AND REMANDED.

TODD, P.J. (M.S.) and LEWIS, J., concur.