IRVING PULP & PAPER, LIMITED,
Plaintiff-Appellee, Cross-Appellant,

v.

DUNBAR TRANSFER & STORAGE
CO., INC., et al., Defendants,

Mid-America Distribution Centers, Inc.,
Defendant-Appellant, Cross-Appellee.

Nos. 82–5568, 82–5605.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 13, 1983.

Decided April 19, 1984.

Rehearing Denied April 26, 1984.

Gary K. Smith, Shuttleworth, Smith, Sabbatini & Leach, Memphis, Tenn., Allen L. Shulman, argued, Conklin & Adler, Oak Brook, Ill., for defendant-appellant, cross-appellee.

John R. Smith, Alan B. Thorp, argued, Laughlin, Halle, Regan, Clark & Gibson, Memphis, Tenn., for plaintiff-appellee, cross-appellant.

Before MARTIN and CONTIE, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

CONTIE, Circuit Judge.

Defendant Mid-America Distribution Centers, Inc. (MADC) appeals from a $60,-000 judgment in favor of plaintiff Irving Pulp & Paper, Ltd. (Irving Pulp), for dam-

ages to plaintiff's wood pulp while in the possession of MADC. MADC also appeals from the award of $14,613.00 to Irving Pulp for storage charges incurred by the plaintiff and the award of prejudgment interest on a portion of the total damage award. Irving Pulp cross-appeals based upon the district court's failure to grant greater damages and to grant prejudgment interest on the entire damage award. Tennessee law controls this diversity action. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). For the reasons set forth below, we affirm in part, reverse in part, and remand to the district court for further proceedings.

## I.

The plaintiff, Irving Pulp, is a manufacturer of wood products and is located in Saint John, New Brunswick, Canada. MADC is a Tennessee corporation and a wholly-owned subsidiary of Dunbar Transfer & Storage Co., Inc. At all relevant times, MADC was engaged in the warehousing business. In November 1976, Irving Pulp contracted with MADC to store approximately 8,640 bales of bleached softwood kraft wood pulp in six interconnected warehouses in Memphis, Tennessee.[1] These warehouses were being leased by MADC from Belz Investment Company, Inc. (Belz), and were located near one of Irving Pulp's major customers, Kimberly Clark Corporation (Kimberly Clark). The contract between Irving Pulp and MADC provided that any action against the bailee for loss or injury must be brought within nine months after the bailor received notice that loss or injury to all or part of the goods had occurred. After the contract was executed, the record indicates that the wood pulp arrived at the warehouses in good condition.

On September 13, 1977, the roof on warehouse No. 4 collapsed during a heavy rainstorm. The record indicates that the 1,320 bales of wood pulp located in warehouse

No. 4 came in contact with a great deal of dirt and gravel from the collapsed roof. In addition, the pulp in warehouse No. 4 and the adjacent warehouses suffered additional water damage due to the frequent rainfall which occurred after the collapse. On September 28, 1977, MADC sent written notice of the loss to Irving Pulp. By that time, several representatives of Irving Pulp had already instructed MADC to move the pulp to a dry warehouse as quickly as possible. MADC did not, however, begin to comply with this instruction until it had completed its investigation of the collapse in early November. Indeed, the record indicates that MADC asked Belz to delay its removal of the roof and debris to enable MADC's engineers to make a second inspection of the site.

On November 14, 1977, MADC cancelled its lease with Belz for the warehouses in which the wood pulp was being stored. Two weeks later, Richard Ramsey, vice-president and general manager of MADC, informed Robbie Hanscom, traffic manager for Irving Pulp, that the wood pulp had finally been moved to a dry warehouse. A subsequent inspection of the wood pulp by an Irving Pulp mill chemist revealed that 15% of the pulp was completely useless.

On September 12, 1977, one day prior to the collapse, Irving Pulp had contracted with Kimberly Clark to sell the wood pulp located in the six warehouses at the then prevailing market price of $340 per ton, less a standard discount. This produced a contract price of $556,607.62. Approximately three and one-half months after the collapse, the sales agreement was renegotiated to take into account the unusable wood pulp and the unexpected drop in market price. Accordingly, the pulp was sold to Kimberly Clark in January 1978 at the new market price of $300 per ton, less the standard discount and an additional 17.5% discount for the unusuable pulp. The new contract price was $405,177.64. The record also indicates that Irving Pulp paid MADC a total of $14,613.00 in storage charges for

---

1. The record indicates that each warehouse was separated by a firewall and that the entire structure was approximately 600 feet long and 195 feet wide.

the period from September 1977 to March 1978.

On July 10, 1978, or nine months and twelve days after MADC notified Irving Pulp of the collapse, Irving Pulp initiated this lawsuit. After an extensive trial, the district court, sitting without a jury, ruled that the nine-month contractual limitations period was unreasonable due to MADC's conduct. The court also ruled that while MADC was not negligent in storing the wood pulp in warehouse No. 4, MADC was negligent in failing to protect the pulp from the elements after the collapse. The court awarded Irving Pulp $60,000 in damages which "represented[ed], as best the Court can determine, that amount in damages for which MADC is responsible ...." The court also awarded Irving Pulp $14,613.00 for the additional storage charges it incurred after the collapse and prejudgment interest on (1) one-half of the award for the damaged wood pulp and (2) all of the award for storage charges. Both parties appeal.

## II.

At the outset, MADC contends that Irving Pulp's claim is barred due to Irving Pulp's failure to abide by the nine-month contractual limitations period. It is undisputed that Irving Pulp did not initiate this lawsuit within nine months after receiving notice of the loss.

■ Under Tennessee law, warehouse receipts may contain "[r]easonable provisions as to the time and manner of presenting claims and instituting actions based on the bailment ...." TENN.CODE ANN. § 47–7–204(3). In this context, MADC cites authorities from other states which approve of nine-month limitations periods in warehouse receipts. See Strom International, Ltd. v. Spar Warehouse and Distributors, Inc., 69 Ill.App.3d 696, 26 Ill.Dec. 484, 388 N.E.2d 108, 112 (1979); Upjohn Co. v. Timpany, 168 N.J.Super. 283, 402 A.2d 979, 983 (1979). Even assuming, however, that the nine-month limitations period is a "reasonable provision" under TENN.CODE ANN. § 47–7–204(3), we hold that MADC is equitably estopped from asserting this defense against Irving Pulp.

■ Although the Tennessee Supreme Court has indicated that estoppels are generally not favored, Sturkie v. Bottoms, 203 Tenn. 237, 310 S.W.2d 451, 453 (1958), this defense is available when one party has, with knowledge of the facts, engaged in misleading conduct with the expectation that such conduct shall be acted upon by another party and the other party justifiably relies on such conduct and acts upon it to its detriment. Arthur v. Lake Tansi Village, Inc., 590 S.W.2d 923, 930 (Tenn. 1979); Lawrence County v. White, 200 Tenn. 1, 288 S.W.2d 735, 738 (1956). "The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted." Dukes v. Montgomery County Nursing Home, 639 S.W.2d 910, 912 (Tenn. 1982).

■ After MADC sent written notice of the loss to Irving Pulp on September 28, 1977, the record indicates that Bruce Drost, an attorney for Irving Pulp, and Williams Evans, an attorney for MADC, had several telephone conversations regarding the liability and damages issues. During each of these conversations, Evans indicated that Irving Pulp should forward its damage claim to him and that it would be "taken care of." While MADC characterizes Evans' remarks as "a casual statement by MidAmerica's representative," we believe that Irving Pulp could justifiably rely on these statements as an admission of liability by MADC. Thereafter, on May 31, 1978, MADC reversed its position and informed Irving Pulp that it was denying all liability. This change of position, which occurred over eight months after MADC informed Irving Pulp of the loss, put Irving Pulp in an untenable position. Accordingly, we hold that MADC is estopped from relying upon the nine-month contractual limitations defense. "One cannot justly or equitably lull his adversary into a false sense of security, and thereby cause his adversary

to subject his claim to the bar of the statute of limitations, and then be permitted to plead the very delay caused by his course of conduct as a defense to the action when brought." *Jackson v. Kemp*, 211 Tenn. 438, 365 S.W.2d 437, 440–41 (1963).

## III.

The district court held, and MADC does not contest, that MADC was negligent in failing to protect the wood pulp from the elements following the collapse. The court also held, however, that MADC was not negligent in storing the wood pulp in warehouse No. 4 and thus was not liable for the damage to the wood pulp caused by the actual collapse. Irving Pulp challenges this finding and contends that *all* of the damage to the wood pulp was caused by MADC's negligence.

■ This circuit has held that a district court's finding of negligence or the absence thereof should not be set aside unless clearly erroneous. *Downs v. United States*, 522 F.2d 990, 999 (6th Cir.1975); *Gowdy v. United States*, 412 F.2d 525, 532–33 (6th Cir.), *cert. denied*, 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969). We note, however, that the district court placed an improper evidentiary burden upon the bailee in its analysis of the negligence issue. Under Tennessee law, a bailor establishes a *prima facie* case of negligence on the part of the bailee by proving that (1) the property was delivered to the bailee in good condition, (2) the property was not returned in accordance with the contract or returned in a damaged condition, and (3) the loss or damage was not due to the inherent nature of the property bailed. TENN.CODE ANN. § 24–5–111. Upon such a showing, the bailee assumes both the burden of producing evidence that the damage was not caused by the bailee's negligence and the risk of nonpersuasion of the trier of fact. *Mathews v. Cumberland Chevrolet Co.*, 640 S.W.2d 582, 584–85 (Tenn.App.1982); *Crook v. Mid-South Transfer & Storage Co.*, 499 S.W.2d 255, 259 (Tenn.App.1973). In this case, the district court correctly ruled that Irving Pulp

had established a *prima facie* case of negligence on the part of MADC. The court then, however, ruled that MADC assumed only the burden of production and thus allowed the risk of nonpersuasion to remain with Irving Pulp.

■ Upon a proper allocation of the evidentiary burdens in this case, we hold that the district court's finding that MADC was not negligent in storing the pulp in warehouse No. 4 is clearly erroneous. While MADC's president, Francis Bergtholdt, testified that he was not concerned about the safety of warehouse No. 4, this statement was contradicted by his deposition testimony in a prior lawsuit in which he stated that his company "became increasingly concerned about the condition of the roof, because it continued to require repair work and *hoped it wouldn't fall in*" (Emphasis added). Bergtholdt also stated in the deposition that leaks in warehouse No. 4's roof were a major problem and that the building "was so deteriorated and was so undesirable, we could not attract business for that building." Under Tennessee law, such prior inconsistent statements given under oath in a deposition or on oral testimony cannot be contested and must be accepted as true. *Lawson v. Farmer*, 189 Tenn. 276, 225 S.W.2d 60, 61 (1949); *Gilley v. Jernigan*, 597 S.W.2d 313, 318 (Tenn. App.1979). The record also indicates that a portion of warehouse No. 4's roof had already collapsed several years earlier. While MADC repaired the collapsed portion of the roof, it never tested the structural integrity of the remainder of the roof. We believe this evidence demonstrates that MADC either knew or should have known of the unsafe condition of warehouse No. 4. Accordingly, we hold that MADC failed to carry its burden of proving that it was not negligent in storing the wood pulp in warehouse No. 4 and that it is liable to Irving Pulp for *all* the damage to the wood pulp.

## IV.

### A.

Having determined that MADC is liable for all the damage to the wood pulp, we

now address the issue of damages. Irving Pulp contends that it should recover $151,429.98, or the difference between the September 12, 1977 contract price—$556,607.62—and the January 1978 sale price—$405,177.64. MADC contends that Irving Pulp's damages claim should be reduced by $65,483.29 to account for the January 1978 reduction in market price. MADC explains that it should not be liable for any loss arising from the drop in market price because the wood pulp was available for resale prior to January 1978.

■■■ The district court correctly held that the ordinary and basic measure of damages for injury to personalty is the difference between its market value immediately before and immediately after the injury. *Yazoo & M.V.R. Co. v. Williams*, 182 Tenn. 241, 185 S.W.2d 527, 529 (1945). Application of this rule would preclude Irving Pulp from recovering its losses arising from the January 1978 market price reduction. We believe, however, that this measure of damages would not fully compensate Irving Pulp for the losses which are the proximate result of MADC's negligent conduct. *See Collins v. East Tennessee, Virginia & Georgia Railroad Co.*, 56 Tenn. 841, 850–51 (1874). Following the roof collapse, Irving Pulp could not ascertain the extent of the damage to the wood pulp until after the roof had been completely removed from the pulp. The record indicates, however, that MADC did not complete this task until November 29, 1977, or over six weeks after the collapse. Once the roof was removed, Irving Pulp completed its inspection of the wood pulp and quickly negotiated a new sales agreement with Kimberly Clark. Although Irving Pulp acted with due diligence, the new contract was not completed until after the market price had fallen. We believe that Irving Pulp's ability to promptly renegotiate an agreement with Kimberly Clark was significantly hampered by MADC's failure to remove the roof in expeditious fashion.

As a result, we hold that Irving Pulp's loss arising from the January 1978 market price reduction was the proximate result of MADC's negligent conduct in failing to remove the roof sooner and that Irving Pulp is entitled to recover the full $151,429.98 in damages.

■ MADC also contends that the district court erred in awarding $14,613.00 to Irving Pulp for storage charges paid by Irving Pulp after the collapse.[2] MADC argues that Irving Pulp is not entitled to receive both its consideration for the bailment contract and compensatory damages for MADC's breach of that contract.

This argument is misleading because it assumes that Irving Pulp would have continued to store its pulp in MADC's warehouses after the date of the collapse. This is simply not true. The record indicates that Irving Pulp had sold the wood pulp to Kimberly Clark and that, had the warehouse roof not collapsed, the pulp would have been shipped from the warehouses shortly after the date of sale. Although we agree that MADC is entitled to receive the entire storage fee for September 1977, the month of the collapse, we hold that MADC is not entitled to retain storage fees for the subsequent months which accrued solely as a result of MADC's negligent conduct. *See Lopeman v. Gee*, 40 Wash.2d 586, 245 P.2d 183, 186 (1952). Accordingly, Irving Pulp's award for storage charges is reduced to $13,317.00.

### B.

■■■ In its cross-appeal, Irving Pulp challenges the district court's finding that Irving Pulp is not entitled to receive punitive damages. Under Tennessee law, punitive damages are awarded only in cases involving fraud, malice, gross negligence or oppression, where a wrongful act is done with a bad motive or done so recklessly as to imply a disregard of social obligations, or where there is such willful misconduct or entire want of care as to raise a pre-

---

**2.** After the collapse, Irving Pulp paid storage fees of $1,296.00 for the remainder of September 1977, $2,592.00 a month for October 1977 through January 1978, $2,502.00 for February 1978 and $447.00 for March 1978, for a total of $14,613.00.

sumption of conscious indifference to consequences. *Inland Container Corp. v. March,* 529 S.W.2d 43, 44–45 (Tenn.1975); *Richardson v. Gibalski,* 625 S.W.2d 715, 717 (Tenn.App.1979). Upon a review of the record, we affirm the district court's denial of punitive damages. MADC's actions amount to simple negligence which do not even approach the level of culpability necessary for such an award.

### C.

 The final issue is whether the district court erred in awarding prejudgment interest on a portion of the total damage award. In Tennessee, it is well settled that the trier of fact may, in its discretion, allow prejudgment interest upon an unliquidated claim for property damages or breach of contract. *Johnson v. Tennessee Farmers Mutual Insurance Co.,* 556 S.W.2d 750, 752 (Tenn.1977); *Coke v. United Transportation Union,* 631 S.W.2d 142, 146 (Tenn.App.1982). While we find no abuse of discretion in the district court's decision to award prejudgment interest, we hold that the court's decision to award such interest only on (1) one-half of the award for the damaged wood pulp and (2) all of the award for storage charges is completely unsupported by the record. We therefore remand this case to the district court to determine if prejudgment interest should be awarded on the total compensatory damage award as set forth in this opinion.

Accordingly, the judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED to the district court for further proceedings in accordance with this opinion.