IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT JACKSON

_____

RAINBO BAKING COMPANY OF          Shelby Chancery No. 101675-3
LOUISVILLE, a Delaware Corporation,   C.A. No. 02A01-9510-CH-00223

    Plaintiff,

v.                                                    Hon. D. J. Alissand[...]

RELEASE COATINGS OF
TENNESSEE, INC.,

    Defendant.

FILED

Dec. 3, 1996

Cecil Crowson, Jr.
Appellate Court Clerk

ROBERT L. CRAWFORD and JONATHAN LAKEY, Wyatt, Tarrant & Combs,
Memphis, Attorneys for Plaintiff.

KAREN R. CICALA, Memphis, Attorney for Defendant.

*MODIFIED AND AFFIRMED*

Opinion filed:

_____

TOMLIN, Sr. J.

    Rainbo Baking Company of Louisville ("Rainbo") filed suit in the Chancery
Court of Shelby County against Release Coatings of Tennessee, Inc. ("Release")
seeking compensatory damages from Release for damages allegedly sustained by
Rainbo as a result of the improper straightening of a large quantity of baking pans used
by it in its bakery business. The suit contained a count in negligence and a count in
breach of contract. Release filed a counter-claim seeking to recover from Rainbo the
balance due it for work performed. Following a bench trial, the court issued an opinion
from the bench. In this opinion the court found that upon the evidence presented,
Release was liable to Rainbo. However, the court specifically stated that it did not find
that Rainbo had carried its burden of proof as to damages. The court ordered a
reference to the Master to give Rainbo an opportunity to present additional proof as to
damages, with Release being given an opportunity to present countervailing proof if
desired. Following the Master's hearing, a report was submitted to the chancellor in
which the value of Rainbo's pans was stated. The Master's report was affirmed and
judgment entered thereon in favor of Rainbo. The chancellor dismissed the counter-
claim of Release against Rainbo. Release has raised three issues on appeal: did the

chancellor err in: (1) awarding a judgment against Release when Rainbo failed to prove its case; (2) the manner of determining the amount of damages sustained by Rainbo; and (3) failing to find for Release on its counter-claim. For the reasons hereinafter stated, we modify and affirm the trial court.

Most if not all of the facts are not in dispute. Rainbo, a multi-state baking company, producing as one of its principal products loaves of breads, entered into an oral contract with Release, through David Long, Release's owner and president. The agreement called for Release to clean, reglaze and straighten one thousand two hundred and seventy-eight (1,278) one and a half pound King Pullman baking pans and four hundred and thirty-two (432) one-pound bread pans. At the time this agreement was made, David Long requested of Charles Jackson, the director of manufacturing at Rainbo, that he be provided two of the best pans that Rainbo had in its possession for Release to use as a sample, from which dies would be made for the straightening of the one and a half pound baking pans. Jackson removed two of the pans from Rainbo's production line and gave them to Long, advising him that all of the pans were in about the same shape. At that time, unbeknownst to Jackson, Rainbo held in its possession several new pans which were not offered to Release.

The pans were delivered by Rainbo to Release for straightening. After the job was completed Release returned the pans to Rainbo. A short while thereafter Rainbo contacted Release, advising it that Rainbo was having difficulty with the pans sticking together when stacked, as well as being unable to place the same number of loaves of baked bread on the bread trays as before. Officials of Release traveled to Louisville and met with representatives of Rainbo. Release offered to rework the pans a second time. A representative of Release inquired of Rainbo if there were any new pans available that might be used as a pattern for a new die. Rainbo advised that such a pan was available and presented it to Release.

The pans were reworked a second time and returned by Release to Rainbo. A few months thereafter Rainbo contends that pin holes and small cracks begin to appear

2

in the pans.  Discussions followed between the parties wherein Rainbo contended that the pans had been improperly straightened by Release and were thus rendered unsatisfactory for use in its baking operations.  Release denied it had caused any damages to Rainbo.  At this time, Rainbo owed Release a balance of four thousand one seventy-nine dollars and six cents ($4,179.06) on its agreement.  The parties were unable to resolve their differences and this litigation followed.

This case proceeded to trial.  The complaint was filed in July 1992.  Thereafter, an answer and subsequently an amended answer along with a counter-complaint was filed by Release.  While written interrogatories were filed, there were no depositions taken and no preliminary motions by Rainbo.

At trial, Rainbo presented witnesses who testified as to both the liability of Release as well as the monetary damages incurred by it as a result of Release's improper straightening.  Thereafter Release put on its proof in opposition to claims of liability as well as damage allegedly caused by it.  At the close of all the proof there were no motions by Rainbo for any delay.  Following argument of counsel the court announced its ruling.  The court proceeded at some length in reviewing the proof offered as to the issue of liability of Release, with emphasis given to the proof offered by Rainbo.  The court then stated:

> So the Court finds that indeed the plaintiffs have shown that the defendants did not properly reform theses pans, and then when they did properly reform them the second time in terms of dimensions that because and as a proximate result of the first over expansion thatcaused the premature wear and tear on these pans that caused them to become useless.  Therefore, judgment in favor of the plaintiffs must be rendered against the defendants.
>
> Now, the question is as to the value.  <u>The Court does not find that the plaintiffs carried the burden of proof of fair market value.  What the plaintiff have shown is this is what it costs us.</u>  Now, the plaintiffs, which is to the defendant's advantage, have said that it only has a four year life span, a 48 month life expectancy, and they will be held to that for a future proceeding.  The reason that's advantageous is because obviously that means for 14 months a large percentage of its use has occurred.  But it's not a straight mathematical progression.  It may be for purposes of dealing with the IRS, but it's not in this Court's opinion sufficient to deal with the real world, which is just like the very second you drive that brand new car off the showroom it's depreciated.  You put one mile on it, you've owned it for all of five minutes and it has depreciated a whole lot more than one

3

mile in five minutes.  <u>And the Court does not find that the plaintiff carried that burden of proof.</u>  (emphasis added)

What the Court will do is an order of reference to the Master in order that the plaintiff can get proper expert testimony on that, if possible, to reveal the true fair market value.

Subsequently, counsel for Release inquired of the court as to what exactly was being referred to the Master.  The court responded:

"Fair market value as of the date that these pans were finally taken out of services when they could not be used any longer. . . ."

The court thereafter proceeded at great length to explain to counsel for Rainbo just what type of proof he—the court—was seeking.  Counsel for Release objected, stating:

MS. RENNIESEN: Your Honor, I would object to anymore testimony by any other witnesses, that's what the purpose of the trial is for.  The plaintiffs had every opportunity --

THE COURT: I understand that and I accept the fact that you object.  But I can do that in terms of an order of references.  This is a Court of equity.  The Court has that discretion to do that.

The court then concluded his ruling as follows:

But the burden is on the plaintiffs, now.  If the plaintiff can't carry that burden before the Master, then they will walk away with nothing.  The burden is on them.  By the same token, that doesn't mean it's a one-way street.  Your client has the opportunity to put on countervailing proof.

In the counter-complaint filed by Release the chancellor found in favor of Rainbo.  He also declined to award prejudgment interest.  At the subsequent hearing before the Master, Rainbo presented one witness as an expert. Release presented two witnesses.  The Master found that "the fair market value of the goods in question (baking pans) on February 1991 was $19,904.85."  The chancellor affirmed the Master's report and entered judgment for Rainbo in this amount.

Back to the original hearing. As to the issue of Release's liability to Rainbo, in our opinion, while the proof in this case is quite close, nonetheless we affirm the chancellor. We also are of the opinion that the proof does not preponderate against the holding of the chancellor that Release should not recover on its counterclaim.

After finding for Rainbo on the issue of liability, the chancellor then proceeded to find that Rainbo had **not** carried its burden of proof as to the damages, and the reference to the Master followed. We feel that there was a clear abuse of discretion by the chancellor in ordering a reference to a Master for a retrial of the issue of damages and that the judgment as to damages must be reversed.

The chancellor has the prerogative within the bounds of discretion to order a reference to a Master. In the case before us, it is not so much the question of the right of the chancellor to order a reference herein that concerns this court as it is that by virtue of ordering such a reference, Rainbo, in effect, received a "new trial" or "another bite at the apple" because it was allowed to re-present its case regarding the issue of damages after it had previously failed to do so. As noted, there was never a motion by Rainbo to continue the case or reopen the case in order to obtain a second chance to produce proof as to its damages.

At the trial itself, Rainbo, a commercial baking company operating in at least three states—Kentucky, Tennessee, and Georgia—presented two witnesses on the issue of damages. The first was Charles Jackson, the plant manager of the Atlanta, Georgia bakery. He testified that after it was discovered that the pans straightened by Release would not work, Rainbo bought replacement pans at a price of thirty dollars and twenty five cents ($30.25) each and that the one thousand, two hundred and seventy eight (1,278) pans thus replaced would have cost thirty eight thousand, six hundred sixty nine dollars and thirty cents ($38,669.30). Rainbo's counsel could not qualify this witness to permit him to testify as to the value of the pans at the time of the straightening process by Release. This was the sum and substance of Jackson's testimony.

The second and final witness offered by Rainbo was Robert Thompson, the

5

comptroller of Rainbo at its home office in Louisville, Kentucky. Thompson testified

that he was familiar with the records of the company and that the replacement pans

were in fact acquired at a cost of thirty dollars and twenty five cents ($30.25) each.

While the chancellor allowed Thompson to testify that the pans were sixteen months

old at the time they were worked on by Release and that they had a depreciated value of

about "twenty seven thousand dollars" ($27,000.00), Thompson testified that he had

never participated in selling pans for plaintiff and that he had no idea what the fair

market value of the pans would have been just prior to their straightening. The

chancellor held that Thompson was not qualified to testify as to the fair market value of

these pans due to a lack of experience and knowledge in buying and selling bread pans.

While such testimony was offered by yet another witness at the hearing before

the Master, there was never any contention or proof to the effect that this witness was

not readily available at time of trial or that somehow the burden of proof as to damages

placed upon Rainbo caught it by surprise.

In the opinion of this court our decision in this matter is supported by the case of

Higgins v. Steide, 335 S.W.2d 533, 47 Tenn. App. 42 (Tenn. App. 1959). While the

facts are somewhat different in the two cases, the legal principles enunciated in Higgins

are applicable to the case under consideration. Higgins arose as a result of plaintiff

suffering injuries and damages when struck by defendant's following vehicle. One of

the witnesses to the accident, known to both parties, was a wrecker driver, who was

towing a vehicle on the highway. During the course of the trial it became apparent that

defendant was not going to call the driver of the wrecker as a witness, as anticipated by

plaintiff. The trial began on June 8th and the parties closed their proof shortly

thereafter on June 10th. For its own reasons the court continued the case until Monday,

June 16th. During this interim, counsel for plaintiff had located the wrecker driver in

Chicago, had flown there, taken the witness' statement as to how the accident occurred

and provided him with train fare and a schedule that would get him to Memphis by

Monday morning in time for the trial. On that Sunday evening prior counsel for

plaintiff received a special delivery letter from the witness advising him that he could

6

not come to Memphis and be in court. Counsel for plaintiff proceeded on that Monday morning to explain to the court all that had happened and asked the court to continue the case to the following Wednesday and to reopen the case for proof. After considerable argument, the court granted plaintiff's counsel's request to continue the case two more days to the following Wednesday, with the court announcing that "the case will either proceed with such proof as he tenders to the court in rebuttal or the case will proceed as it would have proceeded this morning."

Counsel for plaintiff flew to Chicago and brought the witness back on the plane and had him in Memphis to testify on Wednesday the 16th. On that morning there was further argument between both counsel and the court. The court advised plaintiff's counsel that there had been no suggestion made at trial the week before about any further proof. Nonetheless, the court stated that it was within its discretion to allow such actions and stated to the jury that the case would be reopened for the purpose of presenting what should be considered rebuttal proof. The witness testified in open court.

In finding that the trial court had abused its discretion in reopening the Higgins case, court in its opinion noted:

> The record shows—and the learned Trial Judge was certainly aware of the record so showing, that Mr. Ewing, one of the counsel who filed this suit and was associated then in the trial, attended the trial of Mr. Higgins had in City Court and from the record made of the traffic trial in City Court counsel for plaintiff was well aware long before the declaration was filed that there was in fact a wrecker, with an automobile attached to it at the scene when this accident occurred. This court stated that plaintiff's counsel was aware of the diligence required of him to have located the witness had he desired to do so and had him present during the trial.

In conclusion this court stated:

> [T]o approve such procedure will establish, in our opinion, such a precedent that could lead to undue prolongation of the trial of cases to the congestion of court dockets and embarrassment of litigants and trial courts.

> We doubt that it is within the exercise of sound discretion to continue a case for the reopening of proof, under the circumstances shown by this record. . . in our opinion there can be no justification for continuing a case

and reopening the proof under the facts here disclosed.

This court then stated that "the Court did unduly extend his judicial discretion in so doing."

A more recent case quite similar to Higgins is that of Gerrety Co., Inc. v. Louis W. Palmieri, et al., 526 A.2d 555 (Conn. App. 1987), where plaintiff lumber company brought suit against defendant seeking to recover for goods sold and delivered. Defendant counterclaimed for damages resulting to his home from the installation of allegedly defective materials. After a jury trial, plaintiff was awarded damages on its complaint and defendant was awarded damages on his counterclaim. The court granted plaintiff's motion to set aside the verdict for the defendant against plaintiff and gave judgment for plaintiff on both the complaint and the counterclaim.

During a recess following the termination of direct examination of defendant by defense counsel, the trial judge informed defense counsel that he had failed to introduce the necessary evidence of diminished value of the house. When court reconvened defense counsel moved to reopen as direct examination. The trial court sustained plaintiff's objections to the motion. No evidence of the diminished value of the house was ever introduced.

In Connecticut, case law has established that damages involved in real property are limited to the diminished value of the property whenever the cost of restoration is dramatically larger than the difference in value. In Gerrety defendant in effect testified that the cost of restoration would be dramatically larger than the difference in value and it would not be economically feasible to make the restorations.

In affirming the action of the trial court in refusing to reopen the proof, the Connecticut Court of Appeals stated:

> The defendant did not present any testimony during his case in chief as to
> the diminution of value of the house. He attempted to reopen his case
> only after the court alerted him to the defect in his case. Whether or not a
> trial court will permit further evidence to be offered after the close of a

8

party's case-in-chief is a matter resting within its sound discretion. . . . As the defendant had been given a full and fair opportunity to present his case, we conclude that the court did not abuse its discretion in not allowing him to reopen his examination after being alerted of his omissions.

In sum, there is nothing in this record to the effect that Rainbo was unaware of its burden of proof. It was well represented by counsel. There were no "hidden" or "reluctant" witnesses. Rainbo simply failed to establish the fair market value of its pans prior to their straightening, along with their diminished value afterwards. The chancellor's action in permitting a retrial on the issue of damages was an injustice to the defendant. Nominal damages may be recovered where a cause of action for a legal wrong is established but there is no proof of actual damage. Womack v. Ward, 186 S.W.2d 619 (Tenn. App. 1945). Only nominal damages are recoverable for the wrongful conversion or detention of personal property, in the absence of proof of actual damage or of the value of the property. Lay v. Bayles, 44 Tenn. 246, 4 Cold. 246 (Tenn. 1867).

However, under these circumstances, Rainbo is entitled to nominal damages. Accordingly, exercising our inherent right to do so, we award Rainbo nominal damages in the amount of one dollar ($1.00).

While we are of the opinion that this case should have been concluded with the hearing before the chancellor, nevertheless we feel constrained to examine the testimony offered at the hearing held by the Master, and accordingly reach the same result. As directed by the chancellor, the hearing was ordered for the purpose of Rainbo finding and presenting expert testimony as to "fair market value." For this purpose, Rainbo presented only one witness, Russell Bundy, Jr., southeast sales manager for Pan-Glow/American Pan Company, a company providing goods and services in competition with Release.

Bundy testified that in 1991 he was provided with several pans by Rainbo that had been straightened and restraightened the second time by Release. He stated that these pans showed the effects of the two straightening efforts. Bundy testified that

assuming in 1991 new 1 ½ pound King Pullman pans sold for thirty-one dollars and fifteen cents ($31.15) each, considering the condition of the pans that he observed, those pans would be worth approximately 50% of the value of a new pan, or 50% of thirty-one dollars and fifteen cents.  Multiplying 1,278 of such pans by this amount, he stated the total value of the pans involved would be nineteen thousand, nine hundred and four dollars and eighty-five cents ($19,904.85).  <u>Bundy was qualified as an expert on the value of bakery pans by virtue of his preliminary testimony.</u>

Bundy's evaluation in this regard was based upon his inspection of several of the subject pans that had already been straightened twice by Release.  He admitted that he did not and had not at any time seen any of Rainbo's baking pans **prior** to them being sent to Release for straightening.

On cross examination by Release's counsel, Bundy was presented with one of Rainbo's used pans that was later identified by David Long, the owner of Release, without contradiction, to be one of the better pans provided to Release by Rainbo to serve as a model for the making of the die to be used in the straightening.  More importantly, this particular pan had not been straightened by Release.  Bundy testified that this pan was worth seven to eight dollars, and was in such a condition that he would not attempt to straighten it.

In this state, the ordinary and basic measure of damages for injury to personal property is the difference between its market value immediately before and immediately after the injury.  <u>Irving Pulp and Paper, Ltd. v. Dunbar Transfer and Storage Co.</u>, 732 F.2d 511 (6th Cir. 1984); <u>Yazoo and M. V. R. Co. v. Williams</u>, 185 S.W.2d 527, 529 (Tenn. 1945); <u>Tennessee Jurisprudence</u>, Damages, § 18, page 42.

In his direct examination which was designed to establish "value", rather than testifying as to the fair market value of Rainbo's sixteen month old pans **prior** to Release's straightening, Bundy mistakenly referred to the cost of new pans that had not experienced the trauma of the baking process for sixteen months.  As a result, Bundy

failed to provide Rainbo with what it needed most—namely, the fair market value of Rainbo's sixteen month-old pans prior to being straightened by Release.

Moreover, in considering Bundy's testimony in its totality, including both direct and cross-examination, he did in essence testify as to both the "before" and "after" value of Rainbo's pans, but with an unintended result. After examining a Rainbo pan identified without contradiction as being one of its best at the time that this contract was entered into, and that had not undergone either straightening process, Bundy testified that this pan had a value of seven to eight dollars. He had earlier testified that the value of Rainbo's pan after two straightenings by Release had a value of fifteen dollars and fifty-seven cents ($15.57). The net effect of this testimony is that the pans of Rainbo were in such a condition that their value was enhanced—almost doubled—by virtue of the straightening process performed by Release and that Rainbo suffered no loss. Once again Rainbo failed to carry its burden of proof as to damages.

Accordingly, the judgment of the trial court awarding Rainbo damages in the amount of nineteen thousand, nine hundred and eighty-five cents ($19,900.85) is modified. Rainbo is in lieu thereof awarded nominal damages in the amount of one dollar ($1.00). The decree of the chancellor is in all other respects affirmed. Costs in this cause are taxed one half to Rainbo and one half to Release, for which execution may issue if necessary.

_____
TOMLIN, Sr. J.

_____
CRAWFORD, P.J.                    (CONCURS)

_____
FARMER, J.                    (CONCURS)

11